COLONIAL BANK, a Colorado state-chartered commercial bank; Centennial Bank, a Colorado state-chartered commercial bank; Arapahoe Bank and Trust, a Colorado state-chartered commercial bank; Aurora National Bank–South, a national banking association; FirstBank of South Jeffco, a Colorado state-chartered commercial bank; Independent Bankers of Colorado, a Colorado non-profit corporation; The Colorado Bankers Association, a Colorado non-profit corporation; Petitioners–Appellants,

v.

COLORADO FINANCIAL SERVICES BOARD, and Gates Credit Union, a Colorado state-chartered credit union, Respondents–Appellees.

No. 97CA0436.

Colorado Court of Appeals,
Div. IV.

May 14, 1998.

Rehearing Denied June 18, 1998.

---

* Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, Sec. 5(3), and § 24–51–1105, C.R.S. 1997.

McKenna & Cuneo, L.L.P., I. Thomas Bieging, Patrick B. Augustine, Lawrence S. Ebner, Denver, for Petitioners–Appellants.

Hogan & Hartson, L.L.P., Craig A. Umbaugh, Kathryn W. Bradley, Denver, for Petitioners–Appellants Centennial Bank, First-Bank of South Jeffco, and The Colorado Bankers Association on the Opening Brief.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Richard H. Forman, Senior Assistant Attorney General, Denver, for Respondent–Appellee Colorado Financial Services Board.

Berenbaum, Weinshienk & Eason, P.C., Robert G. Wilson, Jr., Eugene M. Sprague, Denver, for Respondent–Appellee Gates Credit Union.

Opinion by Judge VOGT.

Colonial Bank, Centennial Bank, Arapahoe Bank & Trust, Aurora National Bank–South, FirstBank of South Jeffco, Independent Bankers of Colorado, and The Colorado Bankers Association (the Banks) appeal from a district court judgment affirming an order of the Colorado Financial Services Board (Board) permitting Gates Credit Union (Gates) to expand its field of membership. We affirm.

Gates is a state-chartered credit union which for many years served current and former employees of the Gates Corporation and its affiliate companies. In August 1995, Gates filed an application with the Board pursuant to § 11–30–101.7, C.R.S.1997, requesting approval of an amendment to its bylaws that would add a community field of membership to its existing employment-based field of membership. The proposed community field of membership was to be comprised of persons living in an area referred to as South Metro Denver, which had a population of approximately 294,500 at the time of the application. As reasons for its requested amendment, Gates cited its aging membership base and impaired prospects for expanding that base because of the phaseout of Gates Corporation's Denver manufacturing operations.

The Banks filed written protests opposing Gates' application. At a public hearing before the Board, Gates and the Banks offered evidence, including expert testimony, supporting and opposing Gates' proposed expansion. Twelve days later the Board reconvened, discussed Gates' application, and voted three to one to approve it. The Board met again by teleconference to review and approve the proposed written findings and order in the matter.

The Banks sought judicial review pursuant to § 24–4–106(7), C.R.S.1997. The district court affirmed the Board's order, and this appeal followed.

I.

The Banks first contend that the Board exceeded its authority by allowing Gates to combine a community field of membership with an employment-based field of membership, in violation of the "single common bond" limitation of § 11–30–103(2), C.R.S. 1997. We do not agree.

A credit union is a cooperative association incorporated for the purpose of promoting thrift among its members and creating a source of credit for them at fair and reasonable rates of interest. Section 11–30–101(1)(a), C.R.S.1997. Unlike banks, credit unions have a statutory limitation on their membership. Section 11–30–103(2) provides in pertinent part that credit union organization and membership, other than those of a central credit union,

shall be limited to groups having a common bond of employment or association or

groups which reside within a well-defined neighborhood, community, or rural district having a population of no more than twenty-five thousand or as otherwise authorized by the board. Small groups which the commissioner determines to lack the potential membership to organize their own credit union may be eligible for membership in an existing credit union if such small groups have a common bond of employment or association. A member of the immediate family of any person who, under the provisions of this article, is eligible for membership in a credit union may also be admitted to membership therein.

This statute, first enacted in 1931 and amended on several occasions since then, has not previously been construed by the Colorado Supreme Court or in any published decision of this court.

The Board interpreted the statute in this case as authorizing the combination of an employment-based field of membership with a community field of membership. It noted that there already were other state-chartered credit unions in Colorado with such a combination. The Board found support for its construction in the second sentence of § 11–30–103(2), which it read as permitting small groups to "join existing credit unions without requiring that the common bond be the same class."

In reviewing the Board's construction of the statute, we must ask two questions. First, if the General Assembly has spoken directly to the precise question at issue, we, like the Board, must give effect to the legislature's unambiguously expressed intent. If, however, the General Assembly has not directly addressed the issue, the question becomes whether the Board's determination is based upon a permissible construction of the statute. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *cf. Popke v. Industrial Claim Appeals Office,* 944 P.2d 677 (Colo.App.1997) (although court as a general rule may not substitute its own statutory construction for reasonable interpretation made by agency, agency interpretation is not binding if it is inconsistent with clear language of statute or with legislative intent).

▪ We are also mindful that the interpretation of a statute by the agency charged with enforcement of that statute is entitled to deference. *Urbish v. Lamm,* 761 P.2d 756 (Colo.1988); *City & County of Denver v. Board of Assessment Appeals,* 802 P.2d 1109 (Colo.App.1990).

The Banks argue that the General Assembly's use of the disjunctive "or" in the first sentence of § 11–30–103(2) ("limited to groups having a common bond of employment ... or groups which reside within a well-defined community") means that Gates has a choice between mutually exclusive alternatives—either an employment-based group or a community, but not both. The Board and Gates respond that the additional phrase at the end of the sentence ("or as otherwise authorized by the board") indicates that the General Assembly intended to confer discretion on the Board to approve a field of membership consisting of a combination of occupational, association, and community bonds if the Board deemed such approval appropriate. Both sides assert that the second sentence in § 11–30–103(2), regarding "small groups," can be read to support their interpretation of the statute.

▪ In our view, § 11–30–103(2) is susceptible of either interpretation, and is therefore ambiguous. *See Estate of David v. Snelson,* 776 P.2d 813 (Colo.1989). Further, the parties have directed us to no legislative history that unambiguously evidences the General Assembly's intent relative to this issue when it added the "or as otherwise authorized" language to the statute in 1977. *See* Colo. Sess. Laws 1977, ch. 121 at 565–66.

The Banks rely on statements from 1977 by legislators and witnesses that are referenced in the attorney general opinion discussed in Part II, below. However, both the statements and the opinion are concerned with a different issue, and do not address whether the Board's predecessor was to have authority to approve credit unions that combine community and employment-based fields of membership.

Because the General Assembly has not directly addressed the issue, the question becomes whether the Board's determination is based upon a permissible construction of the statute. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., supra.*

Rules of statutory construction provide no definitive guidance as to whether the phrase "or as otherwise authorized by the board" is to be construed as an alternative only to the immediately preceding phrase ("having a population of no more than twenty-five thousand"), or as an alternative to the choices set forth earlier in the same sentence ("groups having a common bond of employment or association" or "groups which reside within a well-defined . . . community"). We note that in a somewhat analogous context, the General Assembly has expressly rejected the so-called "last antecedent rule," which provides that relative and qualifying words or phrases generally refer solely to the last antecedent with which they are closely connected. *See* § 2–4–214, C.R.S.1997; *see also Estate of David v. Snelson, supra; People in Interest of M.W.,* 796 P.2d 66 (Colo.App.1990) (when a referential or qualifying clause follows several words or phrases and is applicable as much to the first word or phrase as to the others in the list, then the clause should be applied to all the words or phrases that preceded it).

■ Applying that reasoning to the issue presented here, we conclude that it is permissible to interpret the "or as otherwise authorized" clause as an alternative to all the phrases that precede it, not just to the immediately preceding phrase.

We reject the Banks' contention that a different conclusion is required because federal courts have construed the analogous federal statute as requiring that all members of an occupational credit union share a single, common bond, and as precluding unrelated groups from joining in the same occupational credit union. *See National Credit Union Administration v. First National Bank & Trust Co.,* —— U.S. ——, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998); *First City Bank v. National Credit Union Administration Board,* 111 F.3d 433 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1162, 140 L.Ed.2d 174 (1998).

■ Federal law, though not controlling, is instructive on the issue of construction of a Colorado statute where the state and federal statutes are identical or substantially so. *See Colorado Civil Rights Commission v. Big O Tires, Inc.,* 940 P.2d 397 (Colo.1997). However, federal cases are less useful where the Colorado statute at issue differs significantly from the federal statute.

The Federal Credit Union Act provides in relevant part: "Federal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district." 12 U.S.C. § 1759 (1994). The federal statute does not include the additional language found in § 11–30–103(2)—either the "or as otherwise authorized" language, or the provision regarding small groups, or the provision making a credit union member's immediate family eligible for membership. We find this difference to be significant, in that the Colorado statute appears to afford the Board more discretion than is available to its federal counterpart, and to contemplate a broader range of permissible combinations within credit unions. We accordingly decline to follow the federal cases on which the Banks rely.

In addition to the "small group" and "immediate family" provisions of § 11–30–103(2), other sections of the Colorado credit union statute may be read as exceptions to the statute's "single common bond" limitation on credit union membership. Under § 11–30–103(3), C.R.S.1997, for example, a member who leaves a credit union's field of membership may nevertheless retain membership in the credit union as provided by its bylaws; and under § 11–30–104(1)(k), C.R.S.1997, a credit union may purchase another credit union's assets and "assume the liabilities of the selling credit union and its field of membership," subject to the commissioner's approval.

Citing the maxim "expressio unius est exclusio alterius," the Banks argue that inclusion of these express exceptions must necessarily imply exclusion of any other exceptions to the single common bond limitation. While

such an interpretation is not unreasonable, it is also not unreasonable to conclude that these exceptions, taken together, evidence a legislative intent not to adhere rigidly to the requirement of a bond of a single class for credit unions, but instead to permit flexibility and deviations from the traditional credit union model in situations calling for such flexibility.

In sum, we conclude that the Board's decision to permit the combination proposed by Gates was based on a permissible construction of the statute. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, supra.* We will accordingly not reverse that determination on appeal.

## II.

The Banks next assert that the Board abused its discretion when it approved a community field of membership with a population significantly in excess of the 25,000-person statutory limitation. Again, we disagree.

As quoted above, § 11–30–103(2) limits community fields of membership to "groups which reside within a well-defined neighborhood, community, or rural district having a population of no more than twenty-five thousand or as otherwise authorized by the board." At the time of Gates' application, the population of South Metro Denver was approximately 294,500.

The parties agree that the "or as otherwise authorized" language in § 11–30–103(2) gives the Board discretion to authorize community fields of more than 25,000 people. However, the Banks contend that this discretion is not unlimited; rather, they assert, the Board may only slightly exceed the 25,000 limitation, and then only upon a showing that it is necessary to exceed the limit to achieve parity with any community-based federal credit unions operating in the same community.

The Banks rely on a 1992 opinion by the Colorado Attorney General. In that opinion, the attorney general concluded that § 11–30–103(2) did not permit Lowry Federal Credit Union to convert to a state credit union with a field of membership consisting of the 222,000 residents of Aurora, Colorado. The at-

torney general noted that the Colorado credit union statute was amended in 1977 to extend credit union membership—previously limited to groups having a common bond of occupation or association—to community groups. *See* Colo. Sess. Laws 1977, ch. 121 at 565–66. Legislative history cited by the attorney general indicates that the purpose of the 1977 amendment was to achieve parity between state and federal credit unions, and that 25,000 was selected as the population limit because that was the federal limit in effect in 1977.

Based on this legislative history, the nature and purpose of credit unions, and the wording of the statute itself, the attorney general concluded that the General Assembly had not intended to grant the Commissioner "unbridled authority," and that although the Commissioner could authorize community fields of membership slightly in excess of 25,000, the statute did not permit a credit union with a field of membership the size of the city of Aurora.

■ Although an attorney general opinion is entitled to respectful consideration as a contemporaneous interpretation of the law by a governmental official charged with the responsibility of such interpretation, a court must engage in an independent analysis in resolving an issue of statutory construction. *Colorado Common Cause v. Meyer,* 758 P.2d 153 (Colo.1988). We conclude that the history of the Colorado credit union statute subsequent to 1992 supports a construction of § 11–30–103(2) that is contrary to that advanced by the attorney general.

As a result of the attorney general's 1992 opinion in the Lowry case, the Commissioner reversed his conditional approval of Lowry's application. Lowry sought review in the district court. Declining to follow the attorney general's opinion, the district court concluded that § 11–30–103(2) authorized approval of fields of membership in excess of 25,000 persons.

No appeal was taken. Instead, the interested parties went to the General Assembly during the 1993 legislative session and obtained passage of H.B. 93–1275, which created a new financial services board to oversee

the Commissioner (§ 11–44–101.6, C.R.S. 1997) and established public hearing procedures and standards for community charter applications (§ 11–30–101.7, C.R.S.1997). *See* Colo. Sess. Laws 1993, ch. 259 at 1443–44 and 1447–49. Significantly for this controversy, the General Assembly did not change the crucial language in § 11–30–103(2) relating to the permissible size of the community population, except to substitute the "board" for the "commissioner."

Citing *Ablin v. Richard O'Brien Plastering Co.*, 885 P.2d 289 (Colo.App.1994), the Board argues on appeal that when the General Assembly amends a statutory provision which has been judicially construed but does not substantively alter the terms of the provision, it is presumed that the General Assembly is familiar with the judicial interpretation and has adopted it as part of the law.

We do not agree that that presumption necessarily applies where the previous judicial construction of a statute consists of a single, unpublished district court ruling. However, a review of the tapes of committee hearings and floor debates regarding H.B. 93–1275 demonstrates that the bill was introduced as a direct response to the Lowry case, and was specifically intended to address concerns that Lowry had been permitted to expand from a small base to a large base of more than 200,000 people without any public input. Hearings on H.B. 93–1275 before the House Business Committee, 59th General Assembly, 1st Session (Feb. 12, 1993); House Appropriations Committee (Mar. 19, 1993); Senate Business Committee (Apr. 14, 1993); House floor debate (Apr. 1, 1993); Senate floor debate (May 6, 1993). Repeated references to the Lowry case by sponsors of the bill and by witnesses at committee hearings leave no doubt that the General Assembly was aware of what had been permitted in that case.

Given this awareness, we find it significant that the General Assembly did not amend § 11–30–103(2) to restrict the size of community credit unions or the authority of the Board when it amended the statute in 1993.

■ When the General Assembly has amended a statute, a failure to repeal the agency's interpretation is persuasive evidence that the administrative interpretation was intended by the General Assembly. *Hewlett–Packard Co. v. State*, 749 P.2d 400 (Colo.1988); *National Advertising Co. v. Department of Transportation*, 932 P.2d 871 (Colo.App.1997). The legislative history thus supports the conclusion that the General Assembly intended the Board to have discretion to permit community fields with a population significantly in excess of 25,000 in appropriate cases.

An additional consideration supporting this conclusion is the General Assembly's enactment in 1993 of § 11–30–103.5, C.R.S.1997, which states:

Any credit union with a common bond consisting of groups residing within a well-defined neighborhood, community, or rural district having a population of greater than one hundred thousand shall be limited to one additional branch office until January 1, 1997.

While this section deals with branching authority and not with authorization of community credit unions, it suggests that the General Assembly contemplated that there could be credit unions with community fields of membership in excess of 100,000 persons.

Contrary to the Banks' argument, we do not view the Board's construction as a license to allow a credit union to expand "essentially without limit," or as an unconstitutional, standardless delegation of authority. As noted above, § 11–30–101.7(5) requires the Board to provide for public input and make certain specific findings—including a finding that the neighborhood, community, or rural district is politically, geographically, socially, or economically well-defined—before it may approve a community charter application. Moreover, a community credit union may not expand without limit, but is confined to obtaining members from people who live in the designated community.

■ Finally, we find no support in the language of the statute or in the legislative history for the Banks' argument that Gates had to demonstrate a need to achieve parity with a federally-based community credit union before the 25,000 limit could be exceeded. Although the intent of the 1977 amendments

may have been to achieve parity with federal credit unions, those amendments did not include a requirement that a credit union demonstrate a need for such parity before it could have a community field of more than 25,000. Nor did the General Assembly include such a requirement in the 1993 amendments, even though it added a section setting forth other specific findings the Board must make before it can grant a charter. *See* § 11–30–101.7(5).

■ In this case, the Board's interpretation of the statute as giving it discretion to approve community fields of membership significantly larger than 25,000 was consistent with the Commissioner's previous administrative interpretation in the Lowry case. In light of this and in light of the General Assembly's failure to include language changing that interpretation in 1993, the Board's interpretation was a permissible construction of the statute. Hence, the Board did not abuse its discretion in approving the addition of a 294,500–person community field of membership based on its permissible construction of the statute as affording it such discretion.

### III.

Pursuant to § 11–30–101.7(5)(c), approval of Gates' application required a finding by the Board that South Metro Denver was "politically, geographically, socially, or economically well-defined." The Banks raise two challenges to the Board's finding that it was. They first assert that the finding must be set aside as clearly erroneous because the record compels the conclusion that South Metro Denver clearly is not a single, well-defined community. Second, they contend that the finding constitutes an abuse of discretion because it is contrary to remarks made by Board members who voted in favor of approval of the application. We reject both contentions.

### A.

The central issue at the hearing was whether Gates' proposed field of membership was a "well-defined community," as required under §§ 11–30–101.7(5)(c) and 11–30–103(2).

Both sides presented expert testimony on this issue. Each expert relied on guidelines published by the federal agency charged with approving community fields of membership for federal credit unions. Each then looked at economic and demographic characteristics of the South Metro Denver area, including income and educational levels, and at factors such as shopping patterns and residents' use of medical and recreational facilities.

Although they looked at the same factors, the experts reached different conclusions. Concluding that South Metro Denver was a well-defined community, Gates' expert noted that the entire area was homogeneous, driven by the same economic forces, populated by people with the same socioeconomic characteristics, and well-defined by physical boundaries. The Banks' expert concluded that South Metro Denver consisted of not one, but many well-defined communities, and thus did not comport with the federal regulatory definition requiring a "single, geographically well-defined area where residents interact."

The Board found Gates' expert credible, adopted his opinion, and cited some ten common characteristics (including higher than average home prices and income levels, common shopping patterns, and shared recreational and medical facilities) which contributed to the interaction among the residents of South Metro Denver. The Board also cited federal and state law which, in its view, demonstrated that the Banks were construing the "well-defined community" requirement too narrowly. It concluded that Gates had met its burden of establishing that South Metro Denver was a well-defined community.

■ Like the district court, we review this agency action under the standards set forth in § 24–4–106(7), C.R.S.1997. *See Committee for Better Health Care for All Colorado Citizens v. Meyer*, 830 P.2d 884 (Colo.1992). Under that section, agency action is set aside if the court finds that the agency exceeded its constitutional or statutory authority, made an erroneous interpretation of law, acted in an arbitrary or capricious manner, or made a determination that is unsupported by the evidence in the record. *McClellan v. Meyer*, 900 P.2d 24 (Colo.1995).

In deciding that South Metro Denver was a well-defined community, the Board made a determination of ultimate fact. "Ultimate facts" are conclusions of law or mixed questions of law and fact that are based on evidentiary facts and determine the rights and liabilities of the parties. *Lee v. State Board of Dental Examiners*, 654 P.2d 839 (Colo. 1982); *Halverstadt v. Department of Corrections*, 911 P.2d 654 (Colo.App.1995). An administrative agency's determination of ultimate fact will be set aside on review "only if, assuming there is evidence to support the finding, it is 'contrary to law,' ... stated conversely, an ultimate finding of fact will be sustained if it has a reasonable basis in law." *Board of Assessment Appeals v. AM/FM International*, 940 P.2d 338, 343 (Colo.1997).

We conclude that the testimony of Gates' expert constituted substantial evidence to support the Board's determination that South Metro Denver was a well-defined community. Since the experts differed, it was the responsibility of the Board to weigh and evaluate their testimony and accept the testimony it found more credible. *See Academy Boulevard Bank v. Banking Board*, 30 Colo.App. 331, 492 P.2d 76 (1971). It is not the province of this court to measure the weight of the evidence or to resolve the credibility of witnesses. *Halverstadt v. Department of Corrections, supra.*

We also conclude that the Board's determination had a reasonable basis in law. The Board properly considered federal guidelines which, while not controlling, provided some standards for defining a community. As the Board noted, federal regulators and federal courts, *e.g., Community First Bank v. National Credit Union Administration*, 41 F.3d 1050 (6th Cir.1994), have upheld community fields of membership encompassing several school districts and political jurisdictions; and there is no basis for concluding that Colorado law defines "community" less broadly than does federal law. Further, the Board did not err in considering the 1993 enactment of § 11–30–101.7(5)(c), which requires a finding that the community be "politically, geographically, socially, *or* economically well-defined" (emphasis added), as evidence that the General Assembly intended a broader construction of the "well-defined" requirement than that advanced by the Banks.

We conclude that the Board's determination that South Metro Denver was a well-defined community was supported by evidence in the record and had a reasonable basis in law. Accordingly, that determination will not be disturbed on appeal. *See Board of Assessment Appeals v. AM/FM International, supra.*

## B.

During their discussion held prior to voting on Gates' application, three of the four Board members indicated that they had doubts about whether South Metro Denver was in fact a well-defined community. Two of the three members who expressed these concerns nevertheless voted to approve the application. The Banks assert that the inconsistency between the Board members' statements and their written finding on the well-defined community issue renders their approval of Gates' application an abuse of discretion. We disagree.

In the context of judicial review of an administrative agency decision, "the court's function is to review the decision, not the reasoning underlying it." *Gilpin County Board of Equalization v. Russell*, 941 P.2d 257, 264 (Colo.1997). For that reason, the "mental process rule," which provides that judges cannot be subjected to scrutiny as to the mental process by which they reach their decisions, applies in quasi-judicial administrative proceedings, and prohibits inquiry into the mental processes or procedure by which the administrative decision was reached. The only exception to this rule is when there has been a clear showing of illegal or unlawful action, misconduct, bias, or bad faith on the part of the decision-makers. *Gilpin County Board of Equalization v. Russell, supra.*

There has been no such showing here. As they were required to do under Colorado's Open Meetings Law, § 24–6–401, et seq., C.R.S.1997, the Board members deliberated in open meeting prior to voting.

The deliberation reflects the seriousness with which the members took their responsibility and shows that they considered evidence offered by both sides. They later reviewed and commented on the proposed written findings before adopting them.

The Banks cite isolated remarks by Board members during their deliberations which, taken alone, can be read as inconsistent with the written finding that South Metro Denver was a well-defined community. However, when the record as a whole is considered, there is no basis for concluding that the Board members' approval of Gates' application was tainted by "illegal or unlawful action, misconduct, bias, or bad faith." Absent such a showing, we will not set aside a decision based on comments made during deliberations leading up to that decision.

Administrative proceedings are accorded a presumption of validity and regularity, and all reasonable doubts as to the correctness of administrative rulings must be resolved in favor of the agency. *Van Sickle v. Boyes*, 797 P.2d 1267 (Colo.1990); *Hadley v. Moffat County School District RE–1*, 681 P.2d 938 (Colo.1984). The burden is on the party challenging agency action to overcome the presumption that the agency's acts were proper. *Fedder v. McCurdy*, 768 P.2d 711 (Colo.App.1988). We conclude that the Banks have not met that burden here, and that the district court thus did not err in concluding that there was no abuse of discretion arising out of the Board members' remarks on the well-defined community issue.

The judgment of the district court upholding the Board's order is affirmed.

NEY and RULAND, JJ., concur.