**PENNSYLVANIA BANKERS ASSO-
CIATION and the Pennsylvania
Business Bank, Petitioners**

v.

**PENNSYLVANIA DEPARTMENT OF
BANKING AND TRUMARK FINAN-
CIAL CREDIT UNION, Respondents**

Pennsylvania Bankers Association,
Pennsylvania Business Bank, Fulton
Bank, and Premier Bank, Petitioners

v.

Pennsylvania Department of Banking,
Pennsylvania Department of Revenue,
The Attorney General of the Common-
wealth, and Freedom Credit Union,
Respondents

Pennsylvania Bankers Association and
the Pennsylvania Business Bank,
Petitioners

v.

Pennsylvania Department of
Banking, Respondent.

Pennsylvania Bankers Association
and the Northwest Savings
Bank, Petitioners

v.

Pennsylvania Department of
Banking, Respondent.

Commonwealth Court of Pennsylvania.

Argued Nov. 16, 2005.
Decided March 1, 2006.
Reargument Denied March 31, 2006.*

---

* Judge Leavitt did not participate in this decision.

Raymond P. Pepe, Harrisburg, for petitioner, PA Bankers Association.

Linda Carroll, Deputy Chief Counsel and Howard G. Hopkirk, Sr. Deputy At-

torney General, Harrisburg, for respondent, PA Department of Banking.

Daniel T. Fitch, Philadelphia, for respondent, TruMark Financial Credit Union.

Francis X. Crowley, Philadelphia, for respondent, Freedom Credit Union.

Richard T. Wargo, Jr., Harrisburg, for intervenor, PA Credit Union Association.

BEFORE: COLINS, President Judge, and SMITH–RIBNER, Judge, and PELLEGRINI, Judge, and FRIEDMAN, Judge, and LEADBETTER, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge.

OPINION ON APPEALS BY Judge SIMPSON.

These procedurally complex consolidated cases present issues of first impression which are of great interest to credit unions and banks. The core issue is whether credit unions which convert from group-based to community-based membership obtain an unfair competitive advantage over banks.

---

**1.** *See* Act of May 26, 1933, P.L. 1076, referred to as the Credit Union Act of 1933 (1933 Former Act), *formerly* 14 P.S. §§ 201–226, repealed by the Act of September 20, 1961, P.L. 1548 (Credit Union Act of 1961).

**2.** *See* Section 2·of the 1933 Former Act, *formerly* 14 P.S. § 202. A similar provision is now found in Section 303 of the Credit Union Code; 17 Pa.C.S. § 303.

Credit unions originated in mid–19th century Europe as cooperative associations that were intended to provide credit to persons of small means; they were usually organized around some common theme, either geographic or associational. *Nat'l Credit Union Admin. v. First Nat'l Bank and Trust Co.*, 522 U.S. 479, 493, n. 6, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998) (citations omitted). Following the European example, in the 1920's

# I.

## A. Statutory Background

Credit unions were first covered by legislation in Pennsylvania in 1933.[1] The current Credit Union Code, 17 Pa.C.S. §§ 101–1504, was enacted in 1990. This codified statute permits credit unions to be chartered for the general purpose "of promoting thrift among its members, creating a source of credit for such members at reasonable rates of interest and providing an opportunity for its members to use and control their own money on a democratic basis in order to improve their economic and social condition." 17 Pa.C.S. § 301(a). Since inception, membership in Pennsylvania credit unions has been based on a common bond, which must be specified in the articles of incorporation.[2]

Unlike banks, which are for-profit corporations owned by stockholders, credit unions are owned by depositors. 17 Pa.C.S. §§ 501(b)(1), 505(a); *see Utah Bankers Ass'n v. America First Credit Union*, 912 P.2d 988 (Utah 1996). Technically, a depositor does not deposit funds into a credit union but purchases shares in the corporation. 17 Pa.C.S. § 505(a); *see Utah Bankers Ass'n*. Credit unions are considered

---

many states passed statutes authorizing the chartering of credit unions, and a number of those statutes contained provisions requiring a common bond for membership. *Id.* (citations omitted).

During the Great Depression, in contrast to widespread bank failures, there were no involuntary liquidations of state-chartered credit unions. *Id.* (citations omitted). The cooperative nature of the institutions, which state law common bond provisions reinforced, was believed to have contributed to this result. *Id.* (citations omitted). A common bond provision was included in the District of Columbia Credit Union Act passed by Congress in 1932, and an identical provision was included in the Federal Credit Union Act passed by Congress in 1934. *Id.* (citations omitted).

non-profit corporations and are exempt from federal taxation, *Id.; see* 26 U.S.C. § 501(c)(14)(A), and from state taxation on their profits. 17 Pa.C.S. § 517. However, they are subject to tax on real estate they own. 17 Pa.C.S. § 517. Banks, on the other hand, are subject to all types of taxation, including taxation on profits. *Utah Bankers Ass'n.*

The Credit Union Code was extensively amended, effective February 2003.[3] One of the amendments extended the powers of a credit union by providing Federal parity, that is, the power

> [t]o engage in the activity of . . . expanding its field of membership as authorized by section 109 of the Federal Credit Union Act (48 Stat. 1219, 12 U.S.C. § 1759), subject to reasonable conditions, limitations and restrictions as may be imposed by the [Department of Banking], including, but not limited to, conditions, limitations and restrictions based upon safety and soundness.

17 Pa.C.S. § 501(e)(2). This provision references Section 109(b) of the Federal Credit Union Act, 12 U.S.C. § 1759(b), which permits membership of credit unions to be based on common bonds of association or of geography, in the case of "community credit unions" serving "persons or organizations within a well-defined local community, neighborhood or rural district."

### B. Department of Banking Proceedings

Later in 2003, three state-chartered credit unions gave formal notice to the Department of Banking (Department) of their intent to take advantage of this statutory change and to expand their fields of membership to geography-based community credit unions. These credit unions were: (1) Corry Jamestown Credit Union (Corry Jamestown), located in northwest Pennsylvania; (2) Philadelphia Telco Credit Union d/b/a TruMark Financial Credit Union (TruMark), located in the greater Philadelphia area; and (3) Freedom Credit Union (Freedom), also located in the greater Philadelphia area (collectively, Credit Unions).

The Pennsylvania Bankers Association, the Pennsylvania Business Bank, Northwest Savings Bank, Fulton Bank and Premier Bank (collectively, Banks) protested the notices. Over strenuous objections,[4] Banks' petitions for intervention were granted.[5] The cases proceeded to consolidated hearings.[6]

On December 22, 2004, the Secretary of Banking issued three orders, one for each credit union (First Orders). All three orders dismissed Banks as intervenors. These dismissals are the basis for some of the issues currently before the Court. The Secretary of Banking also permitted conversion of membership fields for Tru-

---

3. Act of December 9, 2002, P.L. 1572, effective in 60 days.

4. Credit Unions specifically denied that Banks had standing to intervene based merely on their claim that they will be directly affected by the applications and challenged the bases for intervention. *E.g.,* Reproduced Record (R.R.) at 61a–68a. These challenges were specifically renewed after hearings and before decision. R.R. at 889a–90a, 914a, 1021a–22a.

5. Intervention was expressly subject to, among other restrictions, the terms of 1 Pa. Code § 35.31(b). R.R. at 151a. This regulation references regular intervention as well as "limited participation" and "tentative participation" intervention.

6. A significant preliminary order was issued in May, 2004 which essentially limited Banks' access to that part of Credit Unions' applications pertaining to business plans.

Mark[7] and Freedom[8] (Conversion Orders). The Conversion Orders are the bases for other issues raised in the Court.

### C. Commonwealth Court Proceedings

#### 1.

Regarding Corry Jamestown, the First Order dismissed Banks and remanded the application to the Department for further proceedings on this credit union's ability to serve its defined community. The First Order was appealed to this Court[9] at No. 158 C.D.2005.[10]

#### 2.

As to TruMark, a dual jurisdiction action was filed with this Court at 42 M.D. 2005. The action has appellate and original jurisdiction components. In the appellate component, the order dismissing Banks as intervenors and allowing TruMark's conversion as well as nine preliminary orders are challenged. In the original jurisdiction component, a declaratory judgment regarding the tax exempt status of state-chartered credit unions is sought.[11] Outstanding preliminary objections to the original jurisdiction component will be addressed in a separate opinion.

#### 3.

Regarding Freedom, the First Order dismissing Banks was also appealed to this Court at No. 157 C.D.2005.

Further, the Conversion Order was the basis for a related dual jurisdiction action at No. 98 M.D.2005. The appellate component is an appeal from the Conversion Order and nine preliminary orders. In the original jurisdiction component, Banks seek a declaratory judgment that tax exemption for state-chartered credit unions is unconstitutional. Preliminary objections to the original jurisdiction component are pending, and they will be addressed in a separate opinion.

### II. Appeal

This opinion is limited to appellate issues. Banks raise five issues on appeal: whether the Department erred in limiting the Banks' participation in the hearings by restricting access to certain information and by dismissing them as intervenors; whether the Department erred in determining that the greater Philadelphia region constitutes a well-defined local community; whether the Conversion Orders are supported by substantial evidence; whether the Department improperly used official notice; and, whether a statutory restriction regarding confidential materials is unconstitutional.

As to standard of review, the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the statutory provisions controlling practice and procedure of Commonwealth agencies have been violated in the proceedings before the agency, or that any finding of fact

---

7. The First Order of December 22, 2004 also granted TruMark's application for conversion.

8. By order of January 21, 2005, the Department granted Freedom's application for conversion.

9. The apparent theory for appeal was that the First Order was a collateral order. *See* Pa. R.A.P. 313. The ability to appeal the order is not challenged.

10. After argument, Banks sought and received permission to discontinue this appeal.

11. The Respondents in the declaratory judgment actions are the Department, the Pennsylvania Department of Revenue, the Attorney General, and the applicable credit union. Also, the Pennsylvania Credit Union Association intervened as a respondent in the original jurisdiction matters.

made by the agency and necessary to support its adjudication is not supported by substantial evidence. 2 Pa.C.S. § 704.

## III. Standing

The threshold issue is whether Banks proved standing. In the First Orders, the Secretary of Banking dismissed Banks as intervenors because they failed to prove standing during the hearings.

## A.

■ On this issue, Banks assert their dismissal as intervenors violated the administrative regulations governing intervention found at 1 Pa.Code § 35.31,[12] as well as fundamental due process requirements. They averred their interests would be adversely affected by unfair competition if credit unions were authorized on a tax-exempt basis to offer services generally equivalent to banks in entire regions of Pennsylvania without the same degree of regulatory scrutiny applied to banks. Relying on case law[13] and Section 103 the Banking Code of 1965 (Banking Code),[14] Banks argue financial institutions as a matter of law have legally protected interests affected by credit union conversion.

The Department counters that Banks pled an interest to support standing, and they were granted permission to participate in hearings; however, they failed to prove any harm or disadvantage during the hearings. Also, the Department contends that as a matter of law the status of credit unions cannot be the basis for a finding of unfair competition because: the alleged competition arises under a different regulatory scheme; competition is ex-

---

**12.** 1 Pa.Code § 35.31, titled "Notice and action on petitions to intervene," provides in pertinent part:

(b) *Action on petitions.* As soon as practicable after the expiration of the time for filing answers to the petitions or default thereof, as provided in § 35.36 (relating to answers to petitions to intervene), the agency will grant or deny the petition in whole or in part or may, if found to be appropriate, authorize limited participation. No petitions to intervene may be filed or will be acted upon during a hearing unless permitted by the agency after opportunity for all parties to object thereto. Only to avoid detriment to the public interest will any presiding officer tentatively permit participation in a hearing in advance of, and then only subject to, the granting by the agency of a petition to intervene.

Banks apparently maintain that once granted, status as intervenor cannot be revoked, and no further proof of standing can be compelled. However, the regulation on which they rely does not state this, and Banks direct our attention to no case law to support this claim. In fact, the weight of authority is to the contrary. *In re Application of Biester,* 487 Pa. 438, 409 A.2d 848 (1979)(vacating order granting intervention and concluding taxpayer lacked further standing); *see Keener v. Zon-*

*ing Hearing Bd. of Millcreek Twp.,* 714 A.2d 1120 (Pa.Cmwlth.1998)(analyzing revocation of intervenor status). As discussed later, where, as here, standing is challenged before the finder of fact, proof is required.

**13.** *Nat'l Credit Union Admin.* (consistent with authority under Administrative Procedure Act, banks have "prudential standing" to contest conversion of membership of federally chartered credit union); *Delaware County Nat'l Bank v. Campbell,* 378 Pa. 311, 106 A.2d 416 (1954)(banking system unique in that failure of one of several competing institutions frequently leads to adverse effects to all); *Pennsylvania Ass'n of Indep. Ins. Agents v. Foster,* 150 Pa.Cmwlth. 572, 616 A.2d 100 (1992) and *Pennsylvania Automotive Ass'n v. State Bd. of Vehicle Mfrs., Dealers and Salespersons,* 121 Pa.Cmwlth. 352, 550 A.2d 1041 (1988) (financial interests of competitors may constitute interest sufficient to confer standing).

**14.** Act of November 30, 1965, P.L. 847, *as amended,* 7 P.S. § 103. Section 103(a)(v) states one of the purposes of the Banking Code is to provide for the "opportunity for institutions subject to this act to remain competitive with each other, [and] with financial organizations existing under other laws of this Commonwealth ...." 7 P.S. § 103(a)(v).

pected among banks and other financial institutions; and, based on case law,[15] the tax status of an entity is an insufficient reason.

Banks rejoin that their threatened interests are substantial because credit union expansions *per se* decrease the scope of competitive opportunities available to banks. Their interests are direct because potential lost profits represent a discernible adverse effect upon which standing may arise. Their interests are immediate because they fall within the class of persons intended to be protected by the previously cited provisions of the Credit Union Code the Federal Credit Union Act relating to community credit unions. Finally, Banks again assert as a separate basis for standing that their interests are protected by Section 103 of the Banking Code.

### B.

■ The leading Pennsylvania case on standing is *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975). The Court discussed the core concept, which is that a person who is not adversely affected in any way by the matter he seeks to challenge is not "aggrieved" thereby and has no standing to obtain a judicial resolution of his challenge. To establish an "aggrieved" status, a party must have a substantial interest, that is, there must be some discernible adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law. Also, an interest must be direct, which "means that the person claiming to be aggrieved *must show causation of the harm* to his interest by the matter of which he complains." *Id.* at 195, 346 A.2d at 282 (emphasis added).

Further, the interest must be immediate and not a remote consequence of the judgment, a requirement addressing the nature of the causal connection.

■ The problem presented here is that Banks did not establish an aggrieved status because they did not prove a direct interest. Specifically, they did not show causation of harm to their interests occasioned by the expansion of Credit Unions' membership fields, despite an opportunity to do so.

Banks argue that potential lost profits represent a discernible adverse effect upon which standing may arise, and they rely on *Pennsylvania Automotive Ass'n v. State Bd. of Vehicle Mfrs., Dealers and Salespersons,* 121 Pa.Cmwlth. 352, 550 A.2d 1041 (1988). In that case, however, a hearing was held and the complaining party, a competitor, "presented economic testimony that the [contested program] would result in a reduced rate of return for dealers." *Id.* at 1044. Therefore, nothing in that opinion or subsequent cases which rely on it supports a presumed harm; rather, that opinion supports the conclusion that while the financial interests of a competitor may constitute an interest necessary to confer standing, proof of that harm may be necessary. There is none here.

Banks also contend that they need not show harm where the legal interest they seek to protect, fair competition with credit unions, is recognized by statute. They assert that the new provisions of the Credit Union Code permitting a geographical membership bond within a well-defined local community empower them.

---

**15.** *City of Pittsburgh v. Alco Parking Corp.,* 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974)(high tax against parking garages upheld even though privately owned garages competed with tax-exempt publicly owned garages); *Commonwealth v. Lukens,* 312 Pa. 220, 167 A. 167 (1933).

We disagree. There is simply no language in the Credit Union Code which in any way supports a different standing test for Banks. Further, there is no language in the Credit Union Code which requires the Department to consider the position of any organization not governed by the Code, such as Banks. Also, there is no provision of the Credit Union Code directing that other financial institutions be allowed to intervene in proceedings under the Code.

■ Although we must "listen attentively to what a statute says[;][o]ne must also listen attentively to what it does not say." *Kmonk–Sullivan v. State Farm Mut. Auto. Ins. Co.*, 567 Pa. 514, 525, 788 A.2d 955, 962 (2001) (citation omitted). "[I]t is a canon of statutory construction that a court has no power to insert a word into a statute if the legislature has failed to supply it." *Vlasic Farms, Inc. v. Pennsylvania Labor Rels. Bd.*, 734 A.2d 487, 490 (Pa.Cmwlth.1999), *aff'd*, 565 Pa. 555, 777 A.2d 80 (2001). *See also Girgis v. Bd. of Physical Therapy*, 859 A.2d 852 (Pa. Cmwlth.2004) (we may not insert a word the legislature failed to supply into a statute).

Alternatively, Banks argue that Section 103 of the Banking Code, which references competition between banks and financial organizations existing under other state laws, is an independent statutory basis for standing. We reject this argument for several reasons. First, Section 103 of the Banking Code states the purposes of that statute. The Banking Code, however, does not apply to credit unions generally or to credit union membership expansions in particular. In short, it is a different statutory scheme.

Second, the Banking Code does not expressly grant banks standing or require intervention in administrative proceedings concerning financial organizations outside the Banking Code. Were we to accept Banks' assertion, banks would have automatic standing in proceedings involving all financial organizations, including credit unions, insurance companies, securities firms, check cashing businesses, and any concern offering financing. In the absence of express direction to that effect, we presume such a broad and unreasonable result was not intended. 1 Pa.C.S. § 1922(1).

■ Third, there is no authority for the conclusion that a general statement of purpose in the Banking Code was intended to implicitly supplant the extensive case law defining standing. Indeed, the contrary is true, because "[s]tatutes are never presumed to make any innovation in the rules and principles of the common law ... beyond what is expressly declared in their provisions...." *In re Holton's Estate*, 399 Pa. 241, 247, 159 A.2d 883, 886 (1960) (citations and quotations omitted). *See also Borough of Pitcairn v. Westwood*, 848 A.2d 158 (Pa.Cmwlth.2004).

Similarly, Banks' reliance on *Delaware County Nat'l Bank v. Campbell*, 378 Pa. 311, 106 A.2d 416 (1954) is misplaced. In that case, a bank protested the establishment of a branch office by another bank. All participants were governed by the same statute, the Banking Code. There was no issue about competition between financial organizations regulated by different statutes, as is the case here.

Considering the foregoing Pennsylvania authority, we hold that in the absence of an express statutory direction, a financial institution which is not governed by the Credit Union Code must satisfy traditional tests for standing to challenge administrative actions pursuant to that statute. Banks here failed to satisfy the traditional test for standing because they did not show harm flowing from the ultimate administrative action.

## C.

 We reach the same conclusion by undertaking an analysis of Pennsylvania law on intervention in administrative proceedings. It is well settled that granting or denying a petition to intervene is within the sound discretion of the agency involved. *W. Chester Area Sch. Dist. v. Collegium Charter School,* 571 Pa. 503, 812 A.2d 1172 (2002); *Wilkinsburg Educ. Ass'n v. Sch. Dist. of Wilkinsburg,* 690 A.2d 1252 (Pa.Cmwlth.1996). A decision on intervention will not be disturbed unless there has been a manifest abuse of discretion. *Wilkinsburg Educ. Ass'n.*

Neither the Credit Union Code nor the Administrative Agency Law, 2 Pa.C.S. §§ 501–508, 701–704, addresses intervention. We therefore turn to the regulations governing intervention in administrative proceedings, 1 Pa.Code §§ 35.27—35.32. 1 Pa.Code § 35.28(a), entitled "Eligibility to intervene," states in pertinent part, with emphasis added:

(a) *Persons.* A petition to intervene may be filed by a person claiming a right to intervene or an interest of such nature that intervention is necessary or appropriate to the administration of the statute under which the proceeding is brought. The right or interest may be one of the following:

(1) A right conferred by statute of the United States or of this Commonwealth.

(2) *An interest which may be directly affected and which is not adequately represented by existing parties, and as to which petitioners may be bound by the action of the agency in the proceeding.* The following may have an interest: consumers, customers or other patrons served by the applicant or respondent; holders of securities of the applicant or respondent; employes of the applicant or respondent; competitors of the applicant or respondent.

(3) Other interest of such nature that participation of the petitioner may be in the public interest.

Banks fail to satisfy any of these requirements so clearly as to compel intervention contrary to the Secretary's exercise of discretion. First, as previously discussed, there is no express statutory right of intervention.

Second, as previously discussed, Banks did not prove that they have an interest that would be "directly affected" by the Department's Conversion Orders. Also, Banks are not "bound" by the Department's Conversion Orders because they possess no rights or obligations as a result of the Orders. *Pittsburgh Palisades Park, L.L.C v. Pennsylvania State Horse Racing Comm'n,* 844 A.2d 62 (Pa.Cmwlth.), *petition for appeal denied,* 578 Pa. 365, 852 A.2d 310 (2004)(intervention denied to prospective competitors); *see Collegium Charter School,* 571 Pa. at 527, 812 A.2d at 1186.

Third, Banks' interest in the Credit Unions' membership expansion requests is not sufficient to compel intervention "in the public interest." In this regard, Banks did not prove that the competing banks will be weakened or that the communities in question will be "overbanked" to the detriment of the public. *See Delaware County Nat'l Bank* (Banking Code was not intended to exclude competition between banks but was intended to exclude such competition likely to weaken banks in an overbanked community, to the detriment of depositors, stockholders and the public).

## D.

Banks call to our attention *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,* 522 U.S. 479, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998). In that case, the United States Supreme Court affirmed a decision

reversing summary judgment entered against banks and a bankers' association. The Supreme Court determined that the interest possessed by competing financial institutions in limiting markets that federal credit unions could serve was arguably within the "zone of interests" to be protected by provisions of the Federal Credit Union Act limiting federal credit union membership to members of definable groups, such that these competing financial institutions had prudential standing under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

While this decision is interesting, it is not controlling here, for several reasons. First and foremost, in *Nat'l Credit Union Admin.*, judgment was entered before hearing. Therefore, the question of the banks' failure to prove allegations of harm was not before the Court. Further, the "zone of interests" analysis arising from case law under the federal Administrative Procedure Act finds no clear analog in Pennsylvania case law. Rather, standing issues in Pennsylvania are governed by the substantial, direct, and immediate interest inquiry.

### E.

In addition, our review of decisions in other states on this standing issue fails to reveal any other state court which adopts the federal "zone of interests" approach. A review of state court decisions addressing the standing of banks in credit union administrative proceedings is helpful.[16]

In *Mo. Bankers Ass'n v. Dir. of Mo. Div. of Credit Unions*, 126 S.W.3d 360 (Mo.2003), a banking organization appealed a decision of the credit union commission permitting a credit union to expand its geographic scope. Important for current purposes, the commission held a hearing, at which the bank parties presented evidence that the expansion constituted unfair competition and that member banks in the area would be negatively impacted. *Id.* at 362. Without discussing the "zone of interests" analysis,[17] the Court determined the bank parties had standing. The Court relied on its interpretation of a state statute.

A similar issue arose in *Utah Bankers' Ass'n.* In that case, a bankers' association brought an action against numerous credit unions seeking relief against a policy adopted by a commissioner of financial institutions permitting geographic expansion of credit unions. Before hearing, summary judgment was entered dismissing the bankers' association. The Utah Supreme Court determined standing existed. Significantly, the Court relied on Utah precedent.[18] In addition, the Court

---

16. In the following cases, banks challenged the expansion of state-chartered credit union membership fields, but the state court did not discuss standing: *Colonial Bank v. Colorado Financial Services Bd.*, 961 P.2d 579 (Colo.Ct.App.1998)(single regulatory system); *Maine Bankers Ass'n v. Bureau of Banking*, 684 A.2d 1304 (Me.1996); *In re North Carolina Sav. and Loan League*, 302 N.C. 458, 276 S.E.2d 404 (1981)(hearing held).

17. In *Mo. Bankers Ass'n v. Dir. of Mo. Div. of Credit Unions*, 2003 WL 104947 (Mo.Ct.App. W.D.2003) (No. W.D.61134), the Missouri Court of Appeals held that banks did not have

standing to challenge the commission's decision. The Court of Appeals specifically declined to adopt the "zone of interests" standing analysis in *Nat'l Credit Union Admin.* The case was subsequently transferred to the Missouri Supreme Court, which did not discuss the issue addressed by the Court of Appeals.

18. Cases from Utah and three other states held that although a complainant generally cannot make a showing of distinct and palpable injury merely by demonstrating that he may suffer from business competition, the rule did not apply to competitors in a regulated industry which challenge agency actions

relied on a unified regulatory scheme applicable to all classes of financial institutions, including banks and credit unions.

The Iowa Supreme Court determined that a bankers' association failed to show standing to challenge several chapters of the Iowa Credit Union Department's administrative rules in *Iowa Bankers Ass'n v. Iowa Credit Union Dep't*, 335 N.W.2d 439 (Iowa 1983). The Iowa Supreme Court expressly rejected the federal "zone of interests" standing analysis. However, at a hearing, the bankers' association proved the following: credit unions compete with banks in providing similar services; and, some banks lost business as a result of credit union share-draft business. *Id.* at 444–45. The Court determined the showing of past lost business due to credit union share-draft business was sufficient to demonstrate a special, injurious effect to its competitive interest. The bankers' association had standing to challenge rules relating to the special injury proved.

## IV.

In summary, cases in Pennsylvania and elsewhere support a conclusion that where banks and credit unions are regulated by separate statutes, banks seeking to overcome objections to intervention in credit union administrative proceedings may proceed to a hearing on averments of competitive injury, but ultimately they must prove some possible harm. Here, there was no proof of possible harm caused to Banks by the Conversion Orders. Thus, no basis for standing exists.

Accordingly, no error is discerned in the First Orders, which dismissed Banks from

further participation. Due to Banks' lack of standing, we affirm the First Orders. *Pittsburgh Palisades Park.* As a result of this disposition, we need not address the other issues raised by Banks seeking review of actions taken by the Department and the Secretary of Banking.[19] As a further consequence, only the original jurisdiction actions challenging the tax treatment of credit unions remain. Preliminary objections in those matters are addressed separately.

Judge LEAVITT did not participate in the decision in this case.

### ORDER re ISSUES on APPEAL

AND NOW, this 1st day of March, 2006, the Orders of the Secretary of Banking dated December 22, 2004, are **AFFIRMED** insofar as they dismissed Petitioners from further participation in administrative proceedings and revoked their status as intervenors. Further, Count I of the dual jurisdiction action at No. 42 M.D. 2005 and Count I of the dual jurisdiction action at 98 M.D.2005 are **DISMISSED**, consistent with the foregoing opinion.

threatening their competitive position. *Utah Bankers Ass'n,* 912 P.2d at 991.

**19.** Regarding the challenge to the Department's preliminary order restricting Banks' access to certain information, we note that

Banks do not contend that this information was relevant to the standing issue, or that they were somehow prevented from proving potential harm.