962 A.2d 609

**PENNSYLVANIA BANKERS ASSOCIATION, Adams County National Bank, Community Banks, Pennsylvania Association of Community Bankers, and Sterling Financial Corporation,**

v.

**PENNSYLVANIA DEPARTMENT OF BANKING, Belco Community Credit Union, Pennsylvania Department of Revenue, Attorney General.**

Appeal of Pennsylvania Department of Banking.

Pennsylvania Bankers Association, Adams County National Bank, Community Banks, Pennsylvania Association of Community Bankers, and Sterling Financial Corporation

v.

Pennsylvania Department of Banking, Belco Community Credit Union, Pennsylvania Department of Revenue, Attorney General

Appeal of Belco Community Credit Union and Pennsylvania Credit Union Association.

Supreme Court of Pennsylvania.

Argued April 16, 2008.

Decided Dec. 17, 2008.

498

Carter David Frantz, Esq., Linda Carroll, Esq., PA Department of Banking, for Pennsylvania Department of Banking.

Howard G. Hopkirk, Esq., Susan Jane Forney, Esq., PA Office of Attorney General, for Attorney General of Pennsylvania.

Francis Crowley, Esq., Laurie Schnarrs Kennedy, Esq., Richard T. Wargo, Jr., Esq., PA Credit Union Association,

Christopher Michael Guth, Esq., Blank Rome, L.L.P., Philadelphia, for Belco Community Credit Union and PA Credit Union Assoc.

Christopher R. Nestor, Esq., Raymond P. Pepe, Esq., Maria Gerarda Macus–Bryan, Esq., Kirkpatrick & Lockhart Preston Gates Ellis, L.L.P., Harrisburg, for PA Bankers Assn., Adams Co. Nat. Bank, Comm. Banks, PA Assn., of Comm. Bnkrs, Sterling Fin. Corp.

Carter David Frantz, Esq., PA Department of Banking, Linda Carroll, Esq., for Pennsylvania Department of Banking.

Christopher R. Nestor, Esq., for Pennsylvania Bankers Association, et al.

Christopher R. Nestor, Esq., Raymond P. Pepe, Esq., Maria Gerarda Macus–Bryan, Esq., Kirkpatrick & Lockhart Preston Gates Ellis, L.L.P., for PA Bankers Assn., Adams Co. Nat. Bank, Comm. Banks, PA Assn., of Comm. Bnkrs., Sterling Fin. Corp.

Francis Crowley, Esq., Laurie Schnarrs Kennedy, Esq., Richard T. Wargo, Jr., Esq., PA Credit Union Association, Christopher Michael Guth, Esq., Blank Rome, L.L.P., for Belco Community Credit Union and PA Credit Union Association.

Howard G. Hopkirk, Esq., Susan Jane Forney, Esq., PA Office of Attorney General, for Attorney General of Pennsylvania.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD and McCAFFERY JJ.

## OPINION

Justice BAER.

We granted allowance of appeal in this matter to clarify the procedure by which the Pennsylvania Department of Banking ("the Department") evaluates a credit union's proposal to amend its membership structure from one premised on commonality of interests to one based on geographic proximity under the Pennsylvania Credit Union Code ("Credit Union

Code"), 17 Pa.C.S. §§ 101–1504. First, we consider whether the Department's regulation at 10 Pa.Code § 3.6 (henceforth, "the mandatory hearing regulation"), which provides that protesting persons "shall be given a hearing," obligates the Department to hold evidentiary hearings whenever a person files a protest challenging a credit union's membership proposal.[1] Second, we examine whether the Commonwealth Court erred in concluding that Section 302 of the Department of Banking Code, 71 P.S. § 733–302 (henceforth, "the non-disclosure provision") is unconstitutional to the extent that it prevents protestors from obtaining discovery concerning a credit union's submission with the Department.[2] After careful review of the relevant regulatory and statutory provisions, we hold that the mandatory hearing regulation is inapplicable to the case before us, and that the Commonwealth Court erred in

1. The mandatory hearing regulation provides in full: "Persons submitting a protest *shall be given a hearing.* The Department, in any matter, reserves the right to conduct hearings at any location it deems to be appropriate." 10 Pa.Code § 3.6 (emphasis added).

2. The non-disclosure provision, which precludes Department employees from disclosing letters, reports, or other documents in its custody, provides in relevant part:

    A.

    (1) This section applies to matters relating to institutions, credit unions and licensees.

    (2) Neither the secretary ... or other employe of the department, shall publish or divulge to anyone any information contained in or ascertained from ... any letter, report, or statement sent to the department, or any other paper or document in the custody of the department, except when the publication or divulgement of such information is made ... pursuant to the provisions of this act, or when the production of such information is required by subpoena or other legal process of a court of competent jurisdiction, or when it is used in deciding whether to prosecute or in prosecutions or other court actions instituted by or on behalf of or at the request of the department, or when referring for investigation to any Federal, State or local law enforcement or any Federal or State financial regulatory agency, including banking, insurance and securities regulatory agencies, or when the department provides information to any Federal or State financial regulatory agency, including banking, insurance and securities regulatory agencies, when the information pertains to an enforcement concern. The information shall be provided as may be necessary or appropriate, as determined in the discretion of the secretary.

71 P.S. § 733–302.

declaring the non-disclosure provision unconstitutional. Accordingly, we reverse the decision of the Commonwealth Court, and remand for further proceedings consistent with this opinion.

To provide context for our analysis, we begin with a brief discussion of how credit unions are organized under the Credit Union Code. Until recently, membership in Pennsylvania's credit unions was limited to groups sharing common bonds of association, such as shared occupations. These common bonds were set forth in each credit union's charter.[3] Effective February 2003, however, the Pennsylvania General Assembly amended the Credit Union Code by adding 17 Pa.C.S. § 501(e) (henceforth, "the federal parity provision"), which authorizes credit unions to amend their field of membership as provided under § 109 of the Federal Credit Union Act, 12 U.S.C. § 1759.[4] Section 109, in turn, provides credit unions with the option of organizing their membership either by common

**3.** *See* 17 Pa.C.S. § 303 (indicating that the articles of incorporation must specify the common bonds of membership). One should note that throughout the proceedings in this matter the courts and the parties frequently use the term "charter" interchangeably with "articles of incorporation." For our purposes, this distinction is immaterial.

For a more detailed explanation regarding the history of Pennsylvania's credit unions, *see Pennsylvania Bankers Ass'n v. Pennsylvania Department of Banking,* 948 A.2d 790 (Pa.2008) *("Pa. Bankers I ").*

**4.** 17 Pa.C.S. § 501(e), titled "Federal Parity," provides:

Notwithstanding any other provisions of this title or any other law ... a credit union shall have the power:

\* \* \*

(2) To engage in the activity of creating, amending or expanding its field of membership as authorized by section 109 of the Federal Credit Union Act (48 Stat. 1219, 12 U.S.C. § 1759), subject to reasonable conditions, limitations and restrictions as may be imposed by the department, including, but not limited to, conditions, limitations and restrictions based upon safety and soundness.

\* \* \*

As referenced, 12 U.S.C. § 1759, titled "Membership," provides:

(b) ... the membership of any Federal credit union shall be limited to the membership described in one of the following categories:

\* \* \*

(3) Community credit union. Persons or organizations within a well-defined local community, neighborhood, or rural district.

bonds of association or, alternatively, by well-defined local communities or districts.

The matter *sub judice* arose when Belco Community Credit Union ("Belco") proposed to amend its charter from an occupation-based credit union to one based on allegedly well-defined local communities, with membership consisting of persons who live, work, worship, volunteer, or attend school in the Counties of Adams, Cumberland, Dauphin, Lancaster, Lebanon, Perry, and York. Although unclear, the record suggests that Belco tentatively notified the Department of its proposal in early 2005. Shortly thereafter, notices of Belco's proposal were published in various legal journals and newspapers inviting interested persons to file comments by May 12, 2005. The Department then considered these comments in deciding whether to approve Belco's proposal. Secretary's Order, 7/8/2005 at 1–2.

On May 26, 2005, Belco filed a formal "notice" of its proposal with the Department,[5] after which the Department re-published Belco's proposal in the *Pennsylvania Bulletin*. The Pennsylvania Bankers Association, the Pennsylvania Business Bank, Fulton Bank, and Premier Bank ("Appellees" or "the Banks") responded by filing a Notice of Protest on June 20, 2005. In their protest, which the Banks asserted was being filed under 10 Pa.Code § 3.5,[6] the Banks made general objections claiming that, if the Department approved Belco's proposal, it would effectively permit a credit union, which is exempt from most taxation, to compete unfairly with commercial banks, which are fully subject to taxation, to the detriment of the Banks, consumers, and state government.[7,8] Relevant

---

5. For a credit union to amend its field of membership, a formal "notice" is filed with the Department, which then approves, limits, or denies the conversion. 17 Pa.C.S. § 501(f). In the instant matter, the record suggests that Belco filed notice prior to May 26, 2005, but did not "perfect" it until that date.

6. For purposes of our discussion, the regulation at 10 Pa.Code § 3.5 provides in substance that interested persons may file protests following a published notice.

7. As fully detailed in *Pa. Bankers I*, 948 A.2d at 792, credit unions are exempt from most taxation, while banks are not. *See also* 17 Pa.C.S.

to our analysis, the Banks also made a request seeking to reserve the right to "petition the Department for an evidentiary hearing" if "necessary and appropriate." Notice of Protest at 7; and also sought access to the Department's "hearing file" so that they could at least prepare meaningful comments based on the information contained therein.[9] In this regard, the Banks alleged that they were entitled to inspect the hearing file pursuant to 10 Pa.Code § 3.4(b) (henceforth, "the hearing file regulation"), which allegedly requires the Department to provide access to such file upon the request of a protesting person.

In a letter dated June 22, 2005, the Deputy Secretary informed the Banks that the Department was unable to ac-

§ 517 ("A credit union ... shall not be subject to taxation except as to real estate owned by it....").

8. The Banks argued, in relevant part:

> 11. Approval of the Application filed by Belco ... will enable the credit union to unfairly compete with the [Banks] by offering financial services in a manner largely indistinguishable from state and federally chartered banks and savings associations without the necessity of paying state and federal taxes as required by banks and savings associations and without compliance with comparable regulatory requirements, including detailed obligations with respect to providing financial services to certain historically underserved areas and populations....
>
> 12. Approval of the Application filed by Belco ... may impair consumer confidence in soundness [sic] of the banking system ... to the detriment of the [Banks] and their customers to the extent Belco is unable to provide an adequate level of service throughout its proposed field of membership....
>
> 13. Approval of the Application filed by Belco ... is not in the best interests of the Commonwealth because it will provide an exemption from taxes to what may become one of the largest financial institutions in this Commonwealth resulting in the substantial loss of revenue required for state and local programs without providing any significant benefit to the citizens of the Commonwealth....

Notice of Protest at 4.

9. According to 10 Pa.Code § 3.1, a "hearing file" consists of the application and supporting materials, and is compiled when the Department is contemplating holding a hearing.

The hearing file regulation specifically provides: "... The hearing file shall be available for inspection in the office of the Department upon written request from a protesting person...." 10 Pa.Code § 3.4(b).

commodate their requests. First, with respect to whether the Banks were entitled to a hearing, the Deputy Secretary explained the Department's position that the decision of whether to hold a hearing is a matter of agency discretion under § 503(a.2) of the Credit Union Code, 17 Pa.C.S. § 503(a.2), and that the Department was exercising its discretion by choosing not to hold a hearing in this instance.[10] Second, with respect to the hearing file, the Deputy Secretary indicated that the Department did not have such a file [11] and that the non-disclosure provision would prohibit the Department from disclosing this information in any event. *See supra* note 2. Finally, the Deputy Secretary stated that the Depart-

---

**10.** The Credit Union Code at 17 Pa.C.S. § 503(a.2), titled "Hearings and Subpoenas," states in relevant part:

(1) The [D]epartment *may* conduct administrative hearings on any matter pertaining to this title, *subject to the provisions of 2 Pa.C.S. [Ch.] 5 Subch. A* (relating to practice and procedure of Commonwealth agencies)....

(emphasis added).

As explained fully later in this opinion, the Deputy Secretary did not address the qualifying clause, "subject to the provisions of 2 Pa.C.S. [Ch.] 5 Subch. A." The referenced provisions include 2 Pa.C.S. § 504, titled "Hearing and Record," which states:

No *adjudication* of a Commonwealth agency shall be valid as to any *party* unless he shall have been afforded reasonable *notice of a hearing and an opportunity to be heard* ....

(emphasis added).

"Adjudication" and "party" are defined under 2 Pa.C.S. § 101 as follows:

"ADJUDICATION." Any final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any ... of the parties....

\* \* \*

"PARTY." Any person who appears in a proceeding before an agency who has a direct interest in the subject matter of such proceeding.

**11.** As noted, the Department's position is that hearing files are compiled only if the Department is contemplating a hearing on an application subject to 10 Pa.Code Ch. 3. Department's Brief at 49–50. In this case, the Department contends that no hearing was ever contemplated, and that, importantly, the regulations at 10 Pa.Code Ch. 3 are inapplicable in any event. We further note that, while the Banks phrase their discovery request in terms of seeking the "hearing file," in accord with the regulatory language, they are, in essence, requesting access to Belco's proposal and supporting materials for the purpose of making general comments with the Department.

ment would accept the Banks' protest as a timely-filed comment, and that the agency would consider any additional comments filed by the Banks within the 30–day review period provided under 17 Pa.C.S. § 501(g) (henceforth, "the deemed approval provision").[12]

On July 1, 2005, the Banks purported to file an administrative "appeal" to the Secretary of Banking raising two claims. First, the Banks challenged the Deputy Secretary's conclusion that the Department had the discretion to not conduct hearings under section 503(a.2) of the Credit Union Code, 17 Pa.C.S. § 503(a.2), noting that the mandatory hearing regulation expressly states that protesting persons "shall be given a hearing." *See* 10 Pa.Code § 3.6, *supra* note 1. Second, the Banks claimed that the hearing file regulation required the Department to maintain a hearing file and permit protestors such as themselves to inspect it upon written request. Finally, the Banks also included a request for a stay of further proceedings pending their appeal.

On July 8, 2005, the Secretary issued a responsive decision denying the Banks relief on all claims. The Secretary first opined that it was unclear whether the Deputy Secretary's June 22, 2005 letter, noted above, was an appealable decision. Secretary's Order at 4–5. The Secretary therefore declined to reach the substance of the Banks' claims, and instead, directed them to file a legal memorandum in support of their right to appeal. *Id.* at 8. Regarding the Banks' request for a stay, the Secretary stated that he was denying relief because the Banks failed to provide legal authority or otherwise develop their argument regarding their entitlement to a stay. *Id.* at 4–7. Finally, the Secretary commented that the Department had only 30 days to review a credit union's proposal under the deemed approval provision, 17 Pa.C.S. § 501(g), and therefore, the Department's authority to deny Belco's conversion had

12. The deemed approval provision of the Credit Union Code states in relevant part: "... [T]he department shall be deemed to have granted approval for a credit union to engage in an activity ... if within 30 days of receipt of written notice from a credit union the department does not act." 17 Pa.C.S. § 501(g). Here, the 30–day period commenced on May 26, 2005, when Belco filed its formal notice to the Department.

expired. The Secretary opined that, given the unambiguous 30–day statutory review period provided in the deemed approval provision, protestors seeking a stay must be diligent and develop meaningful arguments to demonstrate how their interests are at risk prior to the expiration of the 30–day period. The Secretary found that the Banks' argument was deficient because it consisted of general claims of unfair competition, and did not provide any specific assertions describing the Bank's direct interest in Belco's conversion.[13]

Two weeks later, the Department published notice in the *Pennsylvania Bulletin* that Belco's proposal was deemed approved. The Banks then filed a Petition for Review in the Commonwealth Court, wherein they continued to argue that the mandatory hearing regulation and the hearing file regulation entitled them to an evidentiary hearing and to discovery of the hearing file, respectively. In addition, the Banks supplemented these arguments by asserting that: a) section 504 of the Administrative Agency law was an alternative basis that would require the Department to conduct a hearing, *see supra* note 10, and b) that the non-disclosure provision violated due process insofar as it prevented them from obtaining discovery of the hearing file.[14] In response, the Department

13. The Secretary explained, in pertinent part:

> The Department was not given sufficient information by [the Banks] to impose restrictions, limitations or conditions upon Belco ... but was given only a request to obtain documents protected from nondisclosure by [the non-disclosure provision]. [The Banks] stated their intention was to file comments only after they had an opportunity to review the requested material. Yet, the Credit Union Code is very clear about the thirty day time frame and anyone interested in stopping that clock must be diligent and thorough and provide the Department with sufficient information to convince the Department that their property interests are genuinely at risk.... The Department cannot ... restrict the rights of a credit union based on a request for information and general legal arguments....

Secretary's Order, 7/8/2005, at 7.

14. Petition for Review at 12. We note that the Banks raised a second constitutional claim on appeal, asserting that the non-disclosure provision impermissibly restricted their right to engage in public debate, in violation of Article I, Section 7 of the Pennsylvania Constitution, and the First Amendment of the United States Constitution. In this regard, they claimed that the public has a right to examine the proceedings of

and Belco argued that the regulations at 10 Pa.Code Ch. 3 (henceforth, "Chapter 3"), which include both the mandatory hearing regulation and the hearing file regulation at-issue in this case, were wholly inapplicable to credit unions.[15]

In a published decision, a three-judge panel of the Commonwealth Court vacated the deemed approval of Belco's proposal, remanded to the Department for an evidentiary hearing, and directed the Department to make the hearing file available to the Banks. *Pa. Bankers Ass'n v. Pa. Dep't of Banking*, 910 A.2d 767 (Pa.Cmwlth.2006).[16] The court began its analysis by addressing the scope of Chapter 3, and observed that it applies where an entity supervised or regulated by the Department files an "application." 10 Pa.Code § 3.2(a). The

any branch of government. The Commonwealth Court never reached this claim, however, given its holding that the non-disclosure provision was unconstitutional as a matter of due process. As discussed *supra* at 19–20, because we ultimately hold herein that the Commonwealth Court erred in declaring the non-disclosure provision unconstitutional under due process, we remand to the Commonwealth Court to address this alternative constitutional argument.

15. In contrast to the Department and Belco, the Banks claim that credit unions fit within the scope of Chapter 3. 10 Pa.Code § 3.2, titled "Scope," provides in relevant part:

(a) The provisions of this chapter set forth procedures by which the Department [of Banking] ... and other entities established under acts wherein the Department has supervisory or regulatory responsibility, may intelligently inquire into and reach informed decisions with respect to *applications* and in such other cases as the Department in its discretion shall deem proper. These procedures provide a method by which all protesting, objecting and other interested persons may present their views....

(emphasis added)

10 Pa.Code § 3.1, titled "Definitions," provides, in relevant part:

\* \* \*

Application—*A proposal to charter or license an **institution**, to establish a branch, to merge ... or purchase the assets of an institution where the resulting institution is Commonwealth chartered or licensed, or to relocate an office.*

(emphasis added).

\* \* \*

As fully developed later in this opinion, the Department and Belco claim that they could not file an "application" because they are not "institutions," thus removing this case from the scope of Chapter 3. For further development of this argument, *see infra* at 12–13.

16. Senior Judge McCloskey noted his dissent without separate opinion.

court then noted that the word "application" is defined as a "proposal to charter or license an institution." 10 Pa.Code § 3.1. Applying a "plain reading" of these definitions, the court reasoned that, because Belco was an entity regulated by the Department[17] that was proposing to charter itself as a community-based credit union, Chapter 3 applied. As noted earlier, because the mandatory hearing regulation and the hearing file regulation are encompassed within Chapter 3, the Commonwealth Court further concluded that the Department was required under these regulations to: 1) conduct a hearing;[18] and 2) provide the Banks with access to the hearing file, respectively.

Following its analysis of the applicability of Chapter 3, the Commonwealth Court went on to address the Banks' constitutional argument that the non-disclosure provision violated their due process rights insofar as it prevented them from obtaining access to the hearing file. The court began its discussion of this issue by noting our precedent in *Conestoga National Bank of Lancaster v. Patterson,* 442 Pa. 289, 275 A.2d 6 (1971), a case in which two banks protested a competing bank's application to establish a new branch. Similar to the Banks in this case, the protesting banks in *Conestoga* requested an evidentiary hearing and discovery of the bank's branch application. Ultimately, the Department denied these requests and approved the competing bank's proposal to establish a new branch.

On appeal to this Court, the protesting banks in *Conestoga,* 275 A.2d at 8, argued that they were deprived of due process by the refusal of the Department to permit either an eviden-

17. The parties do not dispute that credit unions are regulated by the Department. For further discussion on the Department's regulatory powers, *see* 17 Pa.C.S. § 503 (stating that the Department has supervisory and regulatory authority over credit unions).

18. In this regard, the court rejected the Department's position, noted earlier, that the Department has the discretion to hold hearings pursuant to 17 Pa.C.S. § 503(a.2). *See supra* note 10. While the court acknowledged that § 503(a.2) is phrased using permissive language, the court reasoned that the Department does not necessarily violate this provision by holding a hearing in every case where a protest is filed. Thus, the court concluded that § 503(a.2) was not inconsistent with the mandatory hearing regulation.

tiary hearing or access to the contents of the competing bank's application for a new branch. In addressing this argument, we observed that due process applies in an administrative context where, *inter alia,* an agency's action would directly affect a person's interests. *Id.* at 9–10. We then determined that a commercial bank has a direct interest in a new bank's application for a new branch. *Id.* at 10. Accordingly, we held that the protesting banks in *Conestoga* were entitled to a full panoply of procedural rights as a matter of due process, including, *inter alia,* the right to a hearing and to discovery of the competing bank's application. *Id.* at 11. Relevant to the instant matter, in a footnote, we also addressed whether the non-disclosure provision would prohibit discovery of the competing bank's application. *Id.* at 11 n. 8. In concluding that it did not bar discovery, we observed that the non-disclosure provision included an exception, which permitted disclosure when made pursuant to "any other law of this Commonwealth." [19]

In the instant matter, the Commonwealth Court determined that the facts of *Conestoga* were materially analogous to the facts of this case. As such, the court held that, in addition to the requirements imposed by the mandatory hearing regulation and the hearing file regulation, the Department was likewise obligated under due process to hold evidentiary hearings and provide protesting persons, such as the Banks, with access to the hearing file. Importantly, the court also noted that the current version of the non-disclosure provision did not have the exception, "any other law of this Commonwealth," that was included in the version of the provision that applied in *Conestoga. See supra* note 19. The court concluded that, insofar as the current version of the non-disclosure provision conflicted with the requirements of due process and *Conestoga,* it was unconstitutional.

Subsequently, Belco and the Department filed petitions for allowance of appeal with this Court, which we granted, limited to the following two questions:

[19]. We note that this exception was deleted in 2002, before this case arose.

Whether the plain language of the Credit Union Code and the Department of Banking Code demonstrates the General Assembly's intent to exclude credit unions and their amendments of their field of membership from being subject to the mandatory hearing [regulation] of 10 Pa.Code Chapter 3?

Whether the Commonwealth Court erred in declaring [the non-disclosure provision] unconstitutional to the extent that it prohibits protestors from inspecting hearing files where the court failed to apply the proper standard of review and elevated the importance of a regulation (10 Pa.Code § 3.4) over that of the statute at issue?

*Pennsylvania Bankers Association v. Pennsylvania Department of Banking*, 592 Pa. 14, 922 A.2d 876 (2007) (*per curiam*).[20]

Preliminarily, we note that both of the issues for which we granted allowance of appeal implicate Chapter 3 of the Pennsylvania Code, as it contains both the mandatory hearing regulation and the hearing file regulation. Consequently, we begin our discussion by examining the parties' arguments, respective to whether the Banks are entitled to a hearing and discovery of the hearing file pursuant to the regulations at Chapter 3.

## I.  Chapter 3

As we briefly noted earlier, the Department and Belco take the position that Chapter 3 is inapplicable to the situation before us in this case because credit unions are not "institutions," and therefore, it follows that they cannot file an "application" under Chapter 3. *See* 10 Pa.Code § 3.2(b) (stating that Chapter 3 applies to "applications"); 10 Pa.Code § 3.1 (defining an application as a proposal to license or charter an "institution"). While they acknowledge that "institution" is not expressly defined in Chapter 3, they claim that words not defined under the regulations are to assume the meanings provided in the Department of Banking Code or the Banking

---

**20.** Issues are taken verbatim from our order granting allowance of appeal, but have been reordered for ease of discussion.

Code.[21] *See* 10 Pa.Code § 1.1(b) ("terms not otherwise defined in this title have the meanings specified in the Banking Code or the Department of Banking Code [7 P.S. § 101—71 P.S. § 733–1]."). Turning to these statutes, the Department and Belco observe that the Department of Banking Code defines an institution as a "corporation or a person ... or other type of business entity ... which is subject to the supervision of the department. *The term does not include credit unions ... unless specifically stated otherwise."* 71 P.S. § 733–2(A) (emphasis added). Similarly, they note that the Banking Code defines an institution as an "incorporated institution," which, in turn, is defined as "a bank, a bank and trust company, a trust company or a savings bank" but not a credit union. 7 P.S. § 102. Because credit unions are not "institutions" under either of these statutes, the Department and Belco conclude that Chapter 3 does not apply.

The Department and Belco also argue that, notwithstanding whether credit unions qualify as "institutions," the history of Chapter 3 reveals that it was only intended to apply to specific categories of proceedings, none of which are implicated here. In this regard, they observe that, when the regulations were proposed in the *Pennsylvania Bulletin* in 1972, the preface explained that the regulations were intended to apply only to "specified classes of proceedings, including applications for licenses, charters, branches, mergers, consolidations and office relocations." 2 Pa. B. 2266. The Department and Belco also note that the limited scope of Chapter 3 was mirrored in the language of the regulations, which specified that the provisions set forth the procedure by which the Department could inquire into applications to "charter or license new institutions, to establish branches, to merge or consolidate ... or to relocate offices...." *Id.* Because the instant dispute does not involve any of the enumerated classes mentioned above, but instead, involves an amendment to a charter of an existing credit union, the Department and Belco conclude that this case

21. For the sake of clarity, we note that the Department of Banking Code and the Banking Code, while both employing the nomenclature "code," are, in fact, separate statutes.

falls outside the intended scope of Chapter 3, on this basis as well.

In contrast, the Banks respond that the Department has consistently treated Belco's proposal as an "application" throughout the litigation of this case, noting for example, that the Department referred to Belco's proposal as an "application" in the *Pennsylvania Bulletin*, in the Deputy Secretary's letter, and in its order deeming Belco's conversion approved. Banks' Brief at 22. The Banks also reject the Department's and Belco's claim that we should adopt the definition of "institution" contained in the Department of Banking Code. In this regard, they note that some provisions of the statute include credit unions in the definition of "institution," while others do not. *Compare*, 71 P.S. § 733–2(A) ("[Institution] does not include credit unions or licensees unless specifically stated otherwise.") *with*, 71 P.S. § 733–303 ("For purposes of this section, 'institution' shall include a licensee or credit union."). Given this alleged inconsistency, the Banks conclude that it would be "irrational" and "arbitrary" to select one definition of institution over another. Banks' Brief at 23.

Upon consideration of the foregoing arguments, and after careful review of the relevant regulations and statutes, we are persuaded that Chapter 3 is inapplicable to this case based on the plain language of the regulations. *See Schappell v. Motorists Mut. Ins. Co.*, 594 Pa. 94, 934 A.2d 1184, 1186 (2007) ("In interpreting an administrative regulation, as in interpreting a statute, the plain language of the regulation is paramount.").

As fully detailed by the Department and Belco *supra* at 12–13, Chapter 3 does not specifically define the term "institution." Instead, the Department's regulations include a provision stating that terms not defined therein "have the meanings specified in the Banking Code or the Department of Banking Code...." 10 Pa.Code § 1.1(b). As correctly noted by the Department and Belco, the Department of Banking Code defines the term "institution" as, *inter alia,* a corporation, person, or mutual holding company, *but not "credit unions ...*

*unless specifically stated otherwise."* 71 P.S. § 733–2(A) (emphasis added). The Banking Code also excludes credit unions from the definition of "institution" by defining the term as an "incorporated institution," which, in turn, is defined as "a bank, a bank and trust company, a trust company or a savings bank" and not as a credit union. 7 P.S. § 102. Thus, under either of these definitions, a credit union does not qualify as an "institution" within the meaning of the Department's regulations. It therefore follows that, because a credit union is not an institution, a credit union cannot file an "application," *see* 10 Pa.Code § 3.1, thereby removing the case before us from the scope of Chapter 3. *See* 10 Pa.Code § 3.2(a) (stating that the regulations contained in Chapter 3 apply to "applications").

We find little merit to the Banks' claim that the Department considered Belco's proposal to be an "application" throughout the litigation. In our view, it is immaterial whether the Department referred to Belco's proposal as a generic "application" in its verbiage, as there is no evidence that the Department was using the specific definition of the term "application" encompassed in Chapter 3. Moreover, we likewise disagree with the Banks that it would be "irrational" or "arbitrary" to adopt the definition of institution excluding credit unions in the Department of Banking Code. While the Banks are correct that there are instances in the statute where credit unions are deemed institutions, the general definitions provision applicable to the entire statute, 71 P.S. § 733–2(A), clearly states that institutions do not include credit unions "unless specifically stated otherwise." As such, any alleged inconsistency in the statute in defining the term "institution" to include credit unions can be explained by this exception. We thus fail to see how it would be "irrational" or "arbitrary" to apply the definition excluding credit unions.

Having determined that Chapter 3 does not apply, it therefore follows that the mandatory hearing regulation and the hearing file regulation contained therein cannot provide the legal basis for affording the Banks relief. Nevertheless, this does not end our inquiry. As discussed previously, the Banks

also claim that there are alternative bases supporting their right to a hearing and to discovery of Belco's proposal.[22] We now turn our analysis to these other arguments.

## II.  Section 504

In addition to the regulations provided under Chapter 3, the parties likewise dispute whether the Banks are entitled to a hearing pursuant to Section 504 of the Administrative Agency Law, 2 Pa.C.S. § 504.  As before, the Department and Belco take the position that § 503(a.2) of the Credit Union Code, 17 Pa.C.S. § 503(a.2), controls this matter, and provides the Department with the sole discretion to decide whether to hold a hearing in a given matter.  They note, for example, that § 503(a.2) is phrased using permissive language by using the word "may" instead of the mandatory word, "shall," which they claim indicates the legislature's intent to give the agency the option, rather than the obligation, to conduct hearings.  In their view, by concluding that the Department was required to hold a hearing, the Commonwealth Court erroneously constrained the Department's statutorily granted discretion.

The Banks respond that the Credit Union Code does not give the Department *carte blanche* to grant or deny a request for a hearing.  While they concede that 17 Pa.C.S. § 503(a.2) is phrased using permissive language, they also emphasize that it includes the qualifier, "subject to the provisions of 2 Pa.C.S. [Ch.] 5 Subch.  A." *See supra* note 10.  The Banks note that the provisions at 2 Pa.C.S. [Ch.] 5 Subch.  A. refer to the Administrative Agency Law, which includes 2 Pa.C.S. § 504.  Section 504, in turn, states, "no adjudication . . . shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard. . . ." *Id.* Finally, the Banks note that a "party" is defined as a person with a direct interest in the proceeding.  2 Pa.C.S. § 101.  Because the Banks claim they are parties with

22.  As we indicated earlier, a hearing file is a concept specific to Chapter 3. Because we hold that Chapter 3 is inapplicable in this case, we hereinafter refer to the documents the Banks refer to as a "hearing file" simply as "Belco's proposal."

a direct interest in Belco's membership conversion, they conclude that the Department was required to hold a hearing.

Applying a plain reading of the aforementioned statutory provisions, the Banks make a colorable claim that under §§ 101 and 504 of the Administrative Agency Law, a person with a direct interest in a proceeding is a "party," and a "party" is entitled under § 504 to notice of a hearing and some type of forum in which to be heard. Nevertheless, for the reasons discussed herein, we need not reach this issue because the Banks did not properly raise this theory before the Department.

As noted earlier in our analysis, notice of Belco's proposal to convert its membership was provided on at least two separate occasions in 2005. The first set of notices, which was published in various newspapers and legal journals after Belco tentatively notified the Department of its proposal, invited interested persons to file comments by May 12, 2005. Subsequently, on May 26, 2005, Belco formally filed "notice" of its proposal with the Department. This notice commenced the 30–day approval period provided in the deemed approval provision, 17 Pa.C.S. § 501(g), and prompted the Department to publish a second notification in the *Pennsylvania Bulletin*. Reading these notices in their totality, we believe it was sufficiently clear that any person interested in Belco's conversion needed to file some type of comment, protest, or other document with the Department within the 30–day period. In this case, we are satisfied that the Banks complied with this procedure by filing a timely Notice of Protest on June 20, 2005.

That the Banks' Notice of Protest was timely, however, does not end our analysis. In this regard, we observe that the Banks' protest contained a crucial flaw in that it was filed pursuant to the Department's regulations at Chapter 3, which, as we have already determined, are inapplicable to this matter. Moreover, we note that the relief the Banks requested under Chapter 3 was access to the hearing file so they could prepare meaningful comments, and a reservation of right to petition for a hearing "if necessary and appropriate." Notice

of Protest at 7. It is evident that the Banks never actually requested a hearing, nor did they include any suggestion in their protest that the Administrative Agency Law at 2 Pa. Code Ch. 5 applied. Notably, the protest did not even mention 2 Pa.C.S. § 504, as a basis for a hearing.

Consistent with these observations, after the Banks filed their Notice of Protest, they were informed by the Deputy Secretary that their protest was deficient, and that the mandatory hearing regulation under Chapter 3 was inapplicable. Nevertheless, in filing an administrative appeal from the Deputy Secretary's decision, the Banks requested a stay of the Department's proceedings, again relying solely on the regulations of Chapter 3, and again failing to assert any rights in accord with 2 Pa.Code Ch. 5. In response, the Secretary issued a decision denying the Banks' request for a stay, finding that the Banks waived any right thereto by failing to provide sufficient detail in their pleading. The Banks then filed an appeal to the Commonwealth Court. It was only during this third attempt at perfecting their claims that the Banks finally raised, for the first time, their alleged entitlement to a hearing pursuant to 2 Pa.Code § 504.

It is well settled that issues raised for the first time on appeal are waived. *See Lincoln Phila. Realty Assocs. I v. Bd. of Revision of Taxes,* 563 Pa. 189, 758 A.2d 1178, 1187 (2000) ("By requiring that an issue be considered waived if raised for the first time on appeal, we ensure that the trial court or agency that initially rules on such matters has had an opportunity to consider the issue."); *Wing v. Commonwealth, Unemployment Compensation Review Bd.,* 496 Pa. 113, 436 A.2d 179, 181 (1981) (indicating that an administrative law tribunal, like a trial court, must be given the opportunity to correct its errors as early as possible). As our foregoing discussion illustrates, it is apparent that the Banks did not raise their entitlement to a hearing in their Notice of Protest, nor did they suggest that they were entitled to a hearing under the Administrative Agency Law. We therefore conclude that the Banks waived their putative right to a hearing under 2 Pa. Code § 504.

## III. Due Process

Finally, the parties dispute whether the Banks have a right to a hearing and to discovery of Belco's proposal, as a matter of fundamental due process pursuant to our precedent in *Conestoga.* As noted earlier, *Conestoga,* 442 Pa. 289, 275 A.2d 6, involved a protest filed by two commercial banks that were challenging a competing bank's application to establish a new branch. In determining whether the protesting banks were entitled to a hearing and to access to the competing bank's application, we observed that protesting commercial banks had a direct interest in a competing commercial bank's application for a new branch, and thus, had standing to file a challenge with the Department.[23] Given this conclusion, we held that the protesting banks were entitled to a due process evidentiary hearing and, incident thereto, to access to the application and supporting data of the competing bank. *Id.* at 11.

██ In this case, we need not reach whether the Banks are entitled, as a matter of due process, to an evidentiary hearing, and incident thereto, to discovery under *Conestoga.* It is without question that the right to a due process hearing, like most constitutional rights, can be waived. *See, e.g., Bedford Downs Mgmt. Corp. v. State Harness Racing Comm'n Valley View Downs,* 592 Pa. 475, 926 A.2d 908, 923 (2007) (*per curiam* ) (finding a due process argument waived when it was not raised before the administrative agency); *In re Cicchetti,* 560 Pa. 183, 743 A.2d 431, 443 n. 1 (2000) (acknowledging that a due process claim can be waived for failure to raise it in a timely fashion); *In re Martorano,* 464 Pa. 66, 346 A.2d 22, 27 (1975) (finding a plaintiff's due process claim waived because it was raised for the first time on appeal). In the instant case, as noted in our preceding analysis of § 504, the Banks waived any right to a due process hearing when they failed to establish a direct interest in the

23. While we acknowledge that in *Conestoga* we did not directly use the verbiage of "standing" in our analysis, we implicitly found standing was implicated and indicated, when we concluded, in the classic parlance of a standing claim, that the protesting banks had a direct or substantial interest in challenging the competing bank's application.

controversy, and, consequently their standing as a party with a right to litigate the underlying issue. Again, the Bank's waiver arises from their failure to do no more than request the Department's "hearing file," and articulating a reservation of a right to petition the Department for a hearing, solely in accord with Chapter 3, "if necessary and appropriate." Notice of Protest at 7. As these averments are clearly inadequate to demonstrate a direct interest—and hence, standing—to challenge Belco's proposal, our precedent in *Conestoga*, holding that a party has a right to a hearing and consequential discovery, is not implicated herein.

## IV. The Non–Disclosure Provision

As we observed earlier in this opinion, the Commonwealth Court determined that the non-disclosure provision, 71 P.S. § 733–302, which prohibits Department employees from, *inter alia*, divulging any documents in its custody or disclosing any information contained in papers sent to the Department, was unconstitutional insofar as it precluded the Banks from obtaining discovery of the hearing file. The Commonwealth Court's decision in this regard was premised upon its conclusion that discovery was required both under the hearing file regulation contained in Chapter 3, and pursuant to *Conestoga*. Given our conclusions herein that the Banks are not entitled to a hearing or to discovery pursuant to Chapter 3, and that *Conestoga* is inapplicable because of the Banks failure to establish standing, we hold that the Commonwealth Court erred in declaring the non-disclosure provision unconstitutional.

## V. Conclusion

In summary, we conclude that the regulatory provisions encompassed within Chapter 3, including the mandatory hearing regulation and the hearing file regulation, do not apply in this case. As these regulations do not apply, it follows that they cannot serve as the basis for entitling the Banks to a hearing or to discovery concerning Belco's proposal. Moreover, while we acknowledge that the Banks may have been entitled to a hearing pursuant to § 504 of the Administrative

Agency Law, 2 Pa.C.S. § 504, we hold that this claim is waived given the Banks' failure to raise this issue before the Department. For similar reasons, because the Banks failed to assert adequately a direct interest in Belco's proposal and thereby failed to establish standing, our precedent in *Conestoga* is inapplicable to this matter, and therefore, the Banks are not entitled as a matter of due process to a hearing or to discovery. Finally, as the Banks are not entitled to discovery, the Commonwealth Court erred in declaring the non-disclosure provision unconstitutional. The decision of the Commonwealth Court is therefore reversed, and this matter is remanded to that court to address the Banks' remaining constitutional challenge to the non-disclosure provision.[24,25]

Justice EAKIN, Justice TODD and Justice McCAFFERY join the opinion.

Justice SAYLOR files a concurring and dissenting opinion in which Chief Justice CASTILLE joins.

Justice SAYLOR, concurring and dissenting.

In light of the limited grant of allocatur, peripheral issues are not directly available for consideration at this juncture.

**24.** As noted earlier, the Banks raised a second constitutional claim on appeal to the Commonwealth Court, asserting that the non-disclosure provision violated their right to engage in public debate pursuant to Article I, Section 7 of the Pennsylvania Constitution and the First Amendment to the United States Constitution. The court never reached this claim, however, given its ultimate holding that the non-disclosure provision violated due process. Because we conclude herein that such holding was in error, we remand this matter to the Commonwealth Court to address this remaining constitutional claim.

**25.** We note that the Banks have submitted post-submission communications pursuant to Pa.R.A.P. 2501(b) bringing to our attention a recent amendment to the Department of Banking Code that appears to delineate the procedure by which the Department adjudicates credit union conversions. However, as this amendment was not signed into law until July 8, 2008, and did not take effect until 30 days thereafter, it is not controlling on this case. *See* Act 2008–58 (S.B.484), § 4, approved July 8, 2008, effective in 30 days. *See also Sperry & Hutchinson Co. v. O'Connor*, 488 Pa. 340, 412 A.2d 539 (1980) (noting that, pursuant to the rules of statutory construction, a case pending before our Court when a new statute is enacted is to be decided under the old law).

Nevertheless, the following background adds perspective to my evaluation of the issues before the Court:

The Department of Banking is the administrative agency charged with the implementation of both the Banking and Credit Union Codes.

The Department was presented with a colorable challenge to a notice of a credit union seeking to convert from an occupational-based credit union and expand its field of membership to a seven-county area, which notice was grounded on the notion that such large geographic area constituted a single "well-defined local community, neighborhood, or rural district." 12 U.S.C. § 1759(b)(3), *incorporated into* 17 Pa. C.S. § 501(e)(2). *Cf. American Bankers Ass'n v. NCUA*, No. 1:05–CV–2247, *slip op.,* 2008 WL 2857678, at *10 (M.D.Pa. July 21, 2008) ("To a casual observer familiar with central Pennsylvania, it would likely be a remarkable finding that ... a geographical area of more than 3,000 square miles with a population of over 1.1 million people and encompassing Harrisburg, Hershey, Carlisle, York, Lebanon, Gettysburg, and Shippensburg—constituted a 'well-defined local community' ").

The challenge was asserted by other financial institutions (banks) alleging, among other things, that an unlawful expansion of the field of membership would result in unfair competition, particularly on account of tax advantages enjoyed by credit unions which are not shared by banks. Despite the Department's enforcement obligations and the colorable challenge asserted, the Department refused to provide the challengers with even rudimentary information offered in support of the charter conversion, did not conduct any proceedings, and did not issue a decision of any sort. Rather, the agency permitted the conversion approval to occur by default.

Thus, no Commonwealth administrative agency or court has ever passed on whether or not the seven counties involved fairly represent a well-defined local community.

In my view, the interests of justice would be better served if an agency faced with a colorable challenge of the sort present-

ed by the Banks would respond with a reasoned and developed decision, thus providing interested parties and the public with some assurance of actual statutory compliance in areas of the agency's regulatory province.

In terms of the limited issues for review, initially, I have no difference with the majority's decision to accept the Department's interpretation of its own regulations, namely, that Chapter 3 of those regulations is not applicable to proceedings on credit union charters. Nevertheless, I differ with the majority's approach to the extent it faults the Banks for invoking Chapter 3. *See* Majority Opinion at 515–16, 962 A.2d at 621. At the very least, I believe the terms of Chapter 3 are ambiguous as to their application in proceedings initiated by credit unions. Furthermore, the alternative, default set of procedural regulations, the General Rules of Administrative Practice and Procedure, 1 Pa.Code, Chapter II, are well known to Commonwealth administrative agencies and promote a practice of liberal construction to secure just, speedy, and inexpensive determination of issues presented to agencies. 1 Pa.Code § 31.2. Accordingly, I see no reason not to simply sanction the approach of treating the Banks' protest as such under the default regulations. *See* 1 Pa.Code § 35.23 ("A person objecting to the approval of an application, petition, motion or other matter which is, or will be, under consideration by an agency may file a protest."). The majority's approach also seems to me to be in substantial tension with the Department's actual treatment of the Banks' protest as constituting at least a timely-filed comment, as well as with the Department's concession that, "[i]n the event a substantial and direct property interest is supported in comments that would warrant further due process, the constitution would demand it." Brief for the Department at 34.[1] Finally, as it

1. The Banks' concern with resort to the General Rules appears to be that intervention is generally required as a prerequisite to a request for a hearing. *See* Brief for Appellees at 12. Because, however, a party with a direct interest in an agency proceeding has a right to appeal even in the absence of intervention before the agency, *see Application of El Rancho Grande, Inc.,* 496 Pa. 496, 501–02, 437 A.2d 1150, 1152 (1981) (quoting 2 Pa.C.S. § 702), in my view the requirement should not be rigidly applied by agencies in the face of allegations of direct

appears that the Department has referenced the Chapter 3 regulations as the core procedural framework in its treatment of past credit-union submissions, *see, e.g.*, 33 Pa. B. 6233 (Dec. 20, 2003); 34 Pa. B. 1806 (Apr. 3, 2004), it seems inequitable for the Banks to be prejudiced here for relying on such procedure.

The majority also faults the Banks for failing to request a hearing. *See* Majority Opinion at 515–18, 962 A.2d at 621–22. In their notice of protest, however, the Banks sought production of Belco's conversion notice and related documents and asked to reserve its entitlement to petition for a hearing upon review of such materials. They explained:

> The Protestors will be unable to effectively prepare and submit comments or testimony to the Department regarding the Application filed by the Belco Community Credit Union until the Protestors are afforded a reasonable opportunity to review, copy and analyze portions of the Application and any related materials available in the hearing file other than material that is confidential and not relevant to the interests of the Protestors.

R.R. at 9a. Pursuant to this Court's decisions, an individual or entity with a due process interest in a charter proceeding is entitled to review application materials in furtherance of a protest. *See Conestoga Nat'l Bank v. Patterson*, 442 Pa. 289, 299 & n. 8, 275 A.2d 6, 11 & n. 8 (1971).[2] Thus, I do not regard it as a misstep for the Banks to have reserved the entitlement to a hearing pending review of integrally essential,

interest. Moreover, and again, the ambiguity as to the applicability of the Chapter 3 regulations militates in favor of latitude in the present case.

**2.** Indeed, despite the provisions of Section 302(A.2) of the Credit Union Act, 71 P.S. § 733–302(A.2), the Department itself recognizes that, in a situation where a constitutionally protected property interest is at issue, a hearing is required. In such a situation, the regulations at 1 Pa.Code, Part II would apply to parity notices and any disclosures required to protect constitutional rights would be made, subject to protective agreements to protect the rights of the party to their information.
Brief for the Department at 12; *accord* Brief for Appellant Belco at 19 ("Section 302 does not prohibit disclosure in all circumstances, but rather allows information to be disclosed if necessary to protect constitutional rights.").

requested documents. Rather, I believe that the overarching, dispositive question should always have been whether the Banks' protest raised a sufficient interest related to Belco's notice to implicate an entitlement to a review of the documents and a hearing.

On this issue of interest,[3] the Banks argue that their protest adequately pleaded the Banks' interest in Belco's notice as their right to be free from direct competition in a manner not authorized by law and which could result in a loss of customers to their direct and substantial detriment; their interest in preserving consumer confidence in the banking system which is vital to their economic stability; and their interest in being free from a discriminatory system of taxation which confers tax exemptions upon Belco in a manner not authorized by law.

Brief for Appellees at 33. The Banks note that, in its *Conestoga* decision, this Court held that banks located within a community have standing to challenge branch applications filed by other banks located in the same community. *See Conestoga*, 442 Pa. at 296–97, 275 A.2d at 10 (explaining that "a decision on an application for a branch bank is judicial in nature and involves substantial property rights."); *cf. Delaware County Nat'l Bank v. Campbell*, 378 Pa. 311, 326, 106 A.2d 416, 423 (1954) (holding that a national bank had standing to protest the application of a state bank for a new branch). The Banks observe that a predominate concern arising out of both the *Conestoga* and *Delaware County National Bank* cases was for the health of the overall financial system, in which many types of financial institutions are participants. *See, e.g., Delaware County Nat'l Bank*, 378 Pa. at 324–25, 106 A.2d at 422 (discussing, with reference to the country's experience with bank "runs" during the Great Depression, the impact of the failure of one or more financial

3. Although this Court did not grant allocatur specifically to consider the Banks' interest in and of itself, the interest issue is subsidiary to the question of whether the Banks are entitled to review the application materials (the second question on which the appeal was allowed). Moreover, as the majority addresses the matter, I believe that it is appropriate to set forth my own thoughts here.

institutions upon the financial community at large). Indeed, the Banks emphasize that *Conestoga,* in particular, couched the salient interests broadly, confirming the entitlement of banks to remain competitive with all other types of financial institutions regulated by the Department, as follows:

[W]e believe that it is clear beyond question that substantial property rights are involved in the Banking Department's adjudication here. Those rights include not only the rights of the applicant and the protesting bank but also the rights of *the surrounding financial community.* As has been noted before, the banking system is unique in that the failure of one of several *competing financial institutions* frequently leads not to the enhancement of the relative position of the surviving competitors but to the possible adverse effect to all.

*Conestoga,* 442 Pa. at 298, 275 A.2d at 11 (emphasis added).

To the degree that this Court would depart from the broader concerns expressed in *Conestoga* and accept the counter-position of Belco and the Department that standing requires participation in a common regulatory scheme, the Banks contend that the various statutory codes governing financial institutions, in tandem with the Administrative Code, create such a common scheme for regulation, which obligates the Department to ensure the safety and soundness of all financial institutions and protect their competitiveness. For example, the Banks develop that, under both Section 103(a)(v) of the Banking Code and Section 103(a)(5) of the Savings Association Code of 1967, it is the duty of the Department to provide for "[t]he opportunity" for institutions subject to the Banking Code and associations subject to the Savings Association Code "to remain competitive with each other" and "with financial organizations existing under other laws of this Commonwealth." 7 P.S. §§ 103(a)(v), 6020–3(a)(5).[4] Finally, the

4. Likewise, the Bank observes, Section 202.A of the Department of Banking Code expressly requires the Department to enforce and administer "all laws of this Commonwealth which relate to any institution" in a manner that "will afford the greatest possible safety to depositors, other creditors, and shareholders thereof, ensure the safe and sound conduct of the business of such institutions, conserve their assets,

Banks note that the United States Supreme Court highlighted the role played by restrictions upon the membership of credit unions in holding that commercial banks had standing, under federal jurisprudence, to challenge field-of-membership expansion. *See NCUA v. First Nat'l Bank & Trust Co.,* 522 U.S. 479, 493–94, 118 S.Ct. 927, 935–36, 140 L.Ed.2d 1 (1998) ("As competitors of federal credit unions, respondents certainly have an interest in limiting the markets that federal credit unions can serve, and the NCUA's interpretation [of a statutory field-of-membership restriction] has affected that interest by allowing federal credit unions to increase their customer base.").

The Department and Belco, on the other hand, distinguish *Conestoga* as pertaining only to adverse financial organizations (there, competing banks) governed under the same regulatory scheme. *Accord Pennsylvania Bankers Ass'n v. Pennsylvania Dep't of Banking,* 893 A.2d 864, 871 (Pa.Cmwlth.2006), *rev'd on other grounds,* 598 Pa. 313, 956 A.2d 956 (Pa.2008); *see also Pennsylvania Petroleum Ass'n v. PP & L Co.,* 32 Pa.Cmwlth. 19, 26, 377 A.2d 1270, 1273 (1977) (reasoning that, where a party alleges competitive injury, "such parties have standing only where the alleged competition is prohibited by a regulatory scheme in which both parties participate"), *aff'd on different grounds,* 488 Pa. 308, 412 A.2d 522 (1980). According to the Department, in the regulatory context, the concept of unfair competition can have meaning only within a unique regulatory environment. Both the Department and Belco express the concern, also advanced by the Commonwealth Court in *Pennsylvania Bankers Association,* that if *Conestoga* is read broadly, "banks would have automatic standing in proceedings involving all financial organizations, including credit unions, insurance companies, securities firms, check cashing businesses, any concern offering financing." *Pennsylvania Bankers Ass'n,* 893 A.2d at 871. Like the Commonwealth Court, the Department and Belco perceive this as an unreasonable result. *See id.*

maintain the public confidence in such institutions and protect the public interest." 71 P.S. § 733–202.A.

The Department asserts that, particularly measured against the interests involved in the present case, a requirement of participation in a common regulatory scheme is sensible. In this regard, the Department develops competitive disadvantages of the credit union model, including the fact that such organizations cannot raise capital from investment markets or experience market appreciation since they do not have capital stock, and thus, credit-union capital grows very slowly out of many years of accumulating retained earnings. According to the Department, given the above, the limited size of credit unions, and the different system for insurance, it is highly unlikely that credit union failures would have significant impact on banks. Moreover, the Department concludes, there is no historical or other basis for determining that there is a unique relationship between credit unions and banks to support a finding of a substantial property interest. *See* Brief for the Department at 26 (arguing that "a claim based on competition is disingenuous given highly competitive financial marketplace and the numerous banks in the same market territory. The unrestricted ability of banks to operate in any geographic area without limitation under the law, unlike credit unions, renders their claims hollow."). In response to the Banks' arguments relying on the tax status of credit unions, the Department asserts that "the tax status of an entity is a legally insufficient reason to find unfair competition." Brief for the Department at 28 (citing *Commonwealth v. Lukens*, 312 Pa. 220, 167 A. 167 (1933); *City of Pittsburgh v. Alco Parking Corp.*, 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974)).

Additionally, it is the Department's position that, under the Credit Union Code, it lacks the authority to restrain field-of-membership expansion, except when the safety and soundness of the credit union involved is at issue. Brief for the Department at 30 (citing 17 Pa.C.S. § 501(f)(3)). The Department further expresses the position that protracted proceedings at the behest of competitor banks would harm the interests of credit unions by injecting unnecessary delay into charter conversion proceedings. In this regard, the Department also

relates its concern that the process would be subject to abuse, particularly since credit unions have no reciprocal ability to lodge field-of-membership challenges relative to other financial organizations. The Department also points to the General Assembly's intent to allow state credit unions to engage in activities on par with their federal counterparts upon notice, just as banks may operate on par with federal banks under notice-based parity provisions in the Banking Code. *See* 7 P.S. § 201(c)(i). In this regard, the Department indicated that it does not wish to "circumvent the General Assembly by acting within the thirty-day period simply to deny the credit union its rights to exercise the statutory provision for a deemed approval" of parity-related charter conversions. Brief for the Department at 30. Finally, the Department contends that all the process which was due was provided via public notice and opportunity for comment.

Preliminarily, I differ substantially with the Department's approach to the deemed approval of the charter conversion. Given the public interest in reasoned governmental decision making, where governmental approval is a prerequisite to some action, I believe agencies should expressly accord substantive review when faced with a colorable challenge to the action asserted by an individual or entity having a direct interest.[5] In my view, approval by default despite a challenge such as that asserted by the Banks undermines the appearance of fundamental fairness. While I am sympathetic to the Department's concern with avoiding potential abuses of the review process, I do not agree that the solution to such difficulties is the affordance of no substantive review. *Cf. Pennsylvania Coal Mining Ass'n v. Dep't of Insurance,* 471 Pa. 437, 451, 370 A.2d 685, 692 (1977) (explaining that an agency's deemed approval of a private entity's proposal does

5. Neither Belco nor the Department denies that credit unions compete with banks for patronage. *Cf. First Nat'l Bank,* 522 U.S. at 488 n. 4, 118 S.Ct. at 933 n. 4 ("In this action, it is not disputed that [banks] have suffered an injury in fact because the NCUA's interpretation allows persons who might otherwise be their customers to be members, and therefore customers, of [the credit union].").

not negate the due process rights of persons with direct interests in the proceedings).

Additionally, contrary to the Department's position, I believe that the agency possesses clear statutory authority to regulate parity-driven, field-of-membership expansion beyond the mere assurance of safety and soundness to the affected credit union. Indeed, the Credit Union Code's express authorization of the imposition of "conditions, limitations, and restrictions" on credit union activities includes a specific cross-reference to the parity-related provisions of the Credit Union Code. 17 Pa.C.S. § 501(f)(2) (cross-referencing 17 Pa.C.S. § 501(e)). Thus, it seems clear that the Department should enforce parity-related restrictions, including the maintenance of boundaries for community-based credit unions established by a well-defined local community. *See* 17 Pa.C.S. § 501(e). It is far from clear, however, particularly without adversarial testing, that expansion to a seven-county area in South Central Pennsylvania meets that requirement. *Cf. American Bankers Ass'n*, No. 1:05–CV–2247, *slip op.*, 2008 WL 2857678, at *10. Indeed, in *American Bankers Association*, the district court expressed substantial concern with the underpinnings of a federal administrative agency's decision that a six-county area in South Central Pennsylvania comprised a single well-defined local community.[6]

6. For example, the district court stated as follows:

The organic statute assigns to the NCUA the task of weighing the evidence before it and, after an "appropriate investigation," deciding whether a proposed area is a well-defined local community. As illustrated above, the record contains evidence that supports the agency's findings; however, it also contains a substantial body of evidence contravening the agency's finding that the [six-county area] constitutes a well-defined local community. The NCUA's lopsided decision reflects a certain deafness to the unfavorable evidence of record. Moreover, the record is clear that the agency in this case changed its formal position with respect to the relative weight of the factors, and the agency provided no explanation for the shift. That so much of the evidence contrary to the agency's decision went completely unmentioned hardly inspires confidence that the NCUA's decision was the product of reasoned, deliberative decision-making-particularly where such decision-making occurs entirely *ex parte*. That the agency made an unexplained shift in its approach strongly

I also disagree with the Department's and Belco's approach to the *Conestoga* decision. The broader language of the decision, *see Conestoga*, 442 Pa. at 298, 275 A.2d at 11 (indicating that substantial property rights at issue with regard to bank branch expansion "include not only the rights of the applicant and the protesting bank but also the rights of the surrounding financial community"), seems well justified, when considering that, in today's complex financial marketplace, competition occurs across the boundaries of multiple regulatory schemes. As the United States Supreme Court recognized in *First National Bank,* financial organizations may suffer direct harm, in the form of a loss of customers, due to the actions of credit unions and other competing financial organizations, and thus, maintain an acute interest in ensuring that competitors abide by statutory provisions limiting the markets that they can serve. *See First Nat'l Bank.,* 522 U.S. at 488 n. 4, 492–93, 118 S.Ct. at 933 n. 4, 935. While the specific holding in all cases should be read against their facts, I agree with the Banks that the broader concerns expressed in *Conestoga* to be valid and pertinent here.[7]

Notably, the arguments of both the Department and Belco generally address separately the field-of-membership restrictions and the tax advantages enjoyed by credit unions. A fair response to the Banks' argument, however, entails consideration of these factors in tandem. The Banks are not challenging the tax advantages enjoyed by credit unions as such; rather, they are asserting that the competitive advantage of credit unions, due to their tax-exempt status, is unfairly

suggests that determinism, not documentation, drove the NCUA's decision.
*Id.* at *14.

7. Both the Department and Belco suggest that the Banks challenge might be better suited to the context of branch office approval as opposed to charter conversion. *See* Brief for Appellant Belco at 21–22; Reply Brief for the Department at 9. I find merit in the Banks' position, however, that their interest pertains in both settings. *See* Brief for Appellees at 48 n. 21 ("If, however, the required procedural due process recognized by *Conestoga* applies to a proposal to build a new branch, it is absurd to suggest that it should not, likewise, apply to a proposal to establish an entirely new *system* of branches.").

enhanced by an unlawfully expansive approach to credit union field of membership.[8]  The interest of the Banks seems even more apparent if the statutory field-of-membership restrictions are viewed, as they are by some, as, at least in part, a quid-pro-quo for the tax advantages enjoyed by credit unions.

In view of the above, I differ with the majority's holding that the Banks waived any entitlement to due process protections.  The majority reasons that the Banks did not establish a direct interest in the controversy, since they did nothing more than request the Department's hearing file and offer a reservation of a right to request a hearing.  *See* Majority Opinion at 516–19, 962 A.2d at 622–23.  As developed above, I believe that the Banks' protest and associated arguments, in fact, did substantially more.[9]

As to the production of documents, as previously noted, the Department concedes that at least some reasonable disclosure is required if the Banks are deemed to have a sufficient interest to implicate due process norms.  Having concluded that such interest is present, I would remand to the Department to determine, in the first instance, the scope of the materials to be provided and the conditions for their disclosure.  At this juncture, I would merely note that the Department has acknowledged that much of the information supplied by Belco was not proprietary in nature.  *See* Brief for the Department at 32 ("In field of membership cases, the documents at issue consist of rather benign compilation of geographic, demographic, social, commercial and governmental information from public sources and a discussion by the credit

8.  Certainly, the Department is correct that credit unions also suffer from some competitive disadvantages, and that they enjoy no reciprocal opportunity to challenge other types of licensed or chartered entities in terms of their fields of membership.  Again, however, I believe that other measures are available, short of the outright denial of substantive review, to counteract potential abuses.

9.  I also find the Banks' protest to be materially distinguishable from the challenge to an agency's statement of policy in *Bedford Downs Management Corporation v. State Harness Racing Commission*, 592 Pa. 475, 926 A.2d 908 (2007) (*per curiam*), referenced by the majority, particularly since the challenge in that case was not asserted in the proceedings under review until the filing of a petition for reconsideration.  *See id.* at 499, 926 A.2d at 923.

union as to why those facts support a finding of a community exists for purposes of a credit union field of membership.").

Chief Justice CASTILLE joins this concurring and dissenting opinion.